**CHRYSLER CAPITAL CORPORATION, Cilcorp Lease Management Inc., IOR Capital, Inc., Northern Leasing Company, Inc., and US West Financial Services, Inc., Plaintiffs,**

v.

**CENTURY POWER CORPORATION, Tucson Electric Power Company, Catalyst Energy Corporation, and San Diego Gas & Electric Company, Defendants.**

No. 91 Civ. 1937 (RPP).

United States District Court, S.D. New York.

Nov. 15, 1991.

See also, 137 F.R.D. 209.

Cravath, Swaine & Moore, New York City by Alan J. Hruska, for plaintiffs.

Baker & Botts, Houston, Tex. by Philip J. John, for defendant Catalyst Energy Corp.

Skadden, Arps, Slate, Meagher & Flom, New York City by Barry H. Garfinkel, for defendant San Diego Gas & Elec. Co.

Cahill Gordon & Reindel, New York City by Laurence A. Silverman, for defendant Century Power Corp.

Leboeuf, Lamb, Leiby & MacRae, New York City by Charles Platt, for defendant Tucson Elec. Power Co.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This action arises from a transaction involving the sale and leaseback of an electric generating plant and certain other utility facilities. Plaintiffs Chrysler Capital Corporation ("Chrysler"), Cilcorp Lease Management Inc. ("Cilcorp"), IOR Capital Inc. ("IOR"), Northern Leasing Company Inc. ("Northern Leasing"), and US WEST Financial Services ("U S WEST"), investors in the transaction, seek recovery from defendants Century Power Corporation ("Century") (previously known as Alamito Company, "Alamito"), Catalyst Energy Corporation ("Catalyst"), Tucson Electric Power Company ("Tepco") and San Diego Gas & Electric Company ("San Diego").

The complaint charges Century, Tepco, and Catalyst with violations of Section 10(b) of the Securities and Exchange Act of 1934 ("10(b)"), 15 U.S.C. § 78j, as amended, and Rule 10b–5 thereunder. The several defendants are also charged variously with conspiracy to violate § 10(b) and Rule 10b–5, aiding and abetting the violation of § 10(b) and Rule 10b–5, and various state law claims grounded in fraud. Defendants move pursuant to Fed.R.Civ.P. 12(b) to dismiss all claims against them on the grounds that the federal claims are time-barred and the state law claims fail to state a claim upon which relief may be granted. Defendants also move pursuant to Fed. R.Civ.P. 9(b) to dismiss the fraud claims on the ground that Plaintiffs have not pleaded fraud with particularity. Defendant San

Diego moves separately pursuant to Fed. R.Civ.P. 12(b)(2) for dismissal of all claims against it on the ground that this Court lacks personal jurisdiction over it.

This Court has excluded all matters outside the pleadings and does not convert the 12(b)(6) motions to motions for summary judgement. *Kopec v. Coughlin,* 922 F.2d 152, 154–155 (2d Cir.1991).

## BACKGROUND

In 1984, Alamito and its then parent corporation, Tepco, entered into an agreement (the "Power Sale Agreement") whereby Tepco agreed pursuant to a "take or pay" provision to buy certain minimum amounts of electric power from Alamito's generating plant. Alamito also had a second, separate power sale arrangement which involved both San Diego and Tepco. Under a "Blending Agreement," Alamito would sell power to Tepco, Tepco would "blend" this Alamito power with other Tepco power, and Tepco would sell blended power back to Alamito for re-sale to San Diego pursuant to a service contract, the "Alamito–San Diego Power Sale Agreement". Complaint ¶ 8.

In 1985, Tepco spun off its shares in Alamito to Tepco shareholders. In 1986, Catalyst acquired Alamito in a hostile takeover and thereafter owned almost all of Alamito's common stock. After this takeover, a disagreement arose between Alamito and Tepco, Alamito's former parent corporation, regarding Tepco's obligations under the Power Sale Agreement.

In 1986, Alamito and Tepco reached an understanding which resolved their dispute. The terms of this understanding provided that Alamito would enter into a sale and leaseback transaction involving certain of its facilities, and Alamito and Tepco would enter into a new, long-term "take or pay" agreement for the purchase of power, the "New Power Sale Agreement". The rates provided for in the New Power Sale Agreement were calculated to assure Alamito's ability to make its payments un-

der the lease portion of the sale and lease-back transaction. The New Power Sale Agreement also resulted in a reduced "cost of service" for Alamito and Tepco. In October 1986, Alamito and Tepco agreed to the terms of the New Power Sale Agreement, and on October 24, 1986, Alamito submitted it to the Federal Energy Regulatory Commission ("FERC") for approval. Timely motions to intervene in the FERC proceeding were filed by Tepco and by San Diego.

At an unspecified time in November 1986, Goldman, Sachs & Co. and Drexel Burnham Lambert Inc. offered several investors a private placement memorandum describing the proposed sale and leaseback transaction. Complaint ¶ 12. The five Plaintiffs in this action and Philip Morris Capital Corporation ("Philip Morris")[1] would ultimately become investors in the transaction.

On November 3, 1986, FERC issued a ruling in *Niagara Mohawk Power Corp.,* 37 F.E.R.C. ¶ 61,081 (1986). The essence of the ruling was that a lessee in Alamito's position was obligated to defer any financial gain realized from such a sale and leaseback transaction and apply that gain over the life of the lease toward reducing the cost of service charged to purchasing utilities. In November 1986, shortly after the *Niagara Mohawk* ruling, Alamito was informed by its FERC counsel that the new ruling could affect the proposed sale and leaseback transaction in regard to the rates Alamito would be permitted to charge Tepco. Complaint ¶ 28.

On December 17, 1986, FERC issued an order accepting the rates in the New Power Sale Agreement without suspension and instituted an investigation into the prospective reasonableness of the rates to be charged by Alamito thereunder. Several days later, at the request of the potential investors, Alamito petitioned FERC for clarification of the extent of the investigation. By order of December 29, 1986, FERC restricted the scope of its investiga-

---

**1.** Philip Morris filed a similar but separate suit against these same defendants. That action was dismissed by this Court. *Philip Morris Capital*

*Corp. v. Century Power Corp., et al.,* 778 F.Supp. 141 (S.D.N.Y.1991).

tion to Alamito's capital structure and the rate of return to be allowed on that structure.[2] The sale and leaseback transaction closed on December 31, 1986 with the execution of, among other agreements, a Participation Agreement by the investors, the Plaintiffs and Philip Morris.

Pursuant to these agreements, Plaintiffs and Philip Morris purchased from Alamito an electric power generating unit known as Springerville Unit 1 and an undivided, 50% interest in the common utility facilities of the Springerville Generating Station. The Springerville unit and facilities were then leased back to Alamito for a period of 28 years. On the same date, the New Power Sale Agreement became effective. Under the New Power Sale Agreement, Tepco would buy from Alamito most of the output of Springerville Unit 1 for a period of 28 years at rates which were calculated as covering Alamito's costs of operation, including its lease payments.

As security for its lease payments, Alamito granted each of the six purchasers a security interest in the New Power Sale Agreement.[3] The New Power Sale Agreement expressly prohibited Tepco from unilaterally seeking from FERC a reduction in the rates provided for therein until January 1, 1995.[4] Complaint ¶¶ 10–11. While Tepco was not a party to the transaction, it did deliver to the investors a "Letter of Representation, Consent and Further Agreement" dated December 15, 1986. In this letter, Tepco repeated its understanding of the New Power Sale Agreement and represented the following:

(1) At the FERC public hearings regarding the reasonableness of Alamito's prospective rates, Tepco would not intentionally provide any testimony supporting a position that Alamito's rates were not reasonable;

(2) Tepco would not unilaterally seek reductions from FERC before January 1, 1995; and

(3) Even after January 1, 1995, any relief Tepco might seek from FERC would not impair Alamito's ability to pay its costs of operation, including its lease obligations.

Complaint ¶ 23. San Diego was not a party to any of these agreements.

Plaintiffs claim that in early December 1986, San Diego notified Alamito of its view that under the *Niagara Mohawk* ruling, if the proposed sale and leaseback transaction closed, it would be entitled to a reduction in the rates it was paying Alamito for blended power pursuant to the Alamito–San Diego Power Sale Agreement. Furthermore, San Diego told Alamito that it felt obligated to raise its claim with FERC before the transaction closed or risk waiving it. Plaintiffs allege that Alamito persuaded San Diego not to make its intentions known until after the deal closed for fear the transaction would abort.[5] In this regard, Plaintiffs charge that San Diego suggested that Alamito should "maybe … finesse its documents to our advantage now." Complaint ¶ 30.

In connection with the closing of the sale and leaseback transaction, Alamito's general counsel updated its representations and warranties to the investors with a litigation letter which described Alamito's FERC proceedings involving San Diego, but failed to mention the possibility of San Diego raising a *Niagara Mohawk* challenge to the rates charged by Alamito to San Diego. Plaintiffs claim that Catalyst and Tepco, each of

---

**2.** Ordinarily, a public utility's rates are calculated on those costs that FERC finds are the utility's costs of service plus a rate of return based on the utility's capital structure.

**3.** The investors did not receive a security interest in the Alamito–San Diego Power Sale Agreement, which was the only other power sale agreement to which Alamito was a party.

**4.** A right existed in Tepco to seek such a reduction pursuant to Section 205 or 206 of the Federal Power Act, 16 U.S.C. §§ 824d and 824e.

**5.** Due to the proposed reduction in rates pursuant to the New Power Sale Agreement, Tepco's cost of service to Alamito under the Blending Agreement and Alamito's cost of service to San Diego under the Alamito–San Diego Power Sale Agreement were to be reduced. However, no reduction in Alamito's cost of service due to the capital gain realized by Alamito on the transaction was proposed.

which had made representations and warranties to the investors that it knew of no fact which would adversely affect the transaction, knew of San Diego's intention to apply for a reduction in rates for power supplied by Alamito under the Alamito–San Diego Power Sale Agreement, yet failed to disclose this information. Complaint ¶¶ 22–24, 32–33. The sale and leaseback transaction closed on December 31, 1986.

Over two years later, on February 15, 1989, San Diego filed with FERC a challenge to the rates it was being charged by Alamito, alleging that it was entitled to a set-off for the capital gain Alamito realized from the sale of its facilities. On the same day, the Arizona Corporation Commission ("ACC"), an Arizona state utility regulatory agency, filed a similar challenge to the rates charged to Tepco by Alamito under the New Power Sale Agreement.[6] San Diego and Alamito later entered into a settlement agreement which an administrative law judge has now certified to FERC for approval. *San Diego Gas & Electric v. Century Power Corp.*, 54 F.E.R.C. ¶ 63,024 (March 8, 1991). The administrative law judge also issued an initial decision which basically accepted the ACC's position regarding Alamito's treatment of the gain realized on the sale of its facilities. *Arizona Corp. Comm'n v. Century Power Corp.*, 55 F.E.R.C. ¶ 63,016 (April 30, 1991). FERC review of that decision is now pending.

Plaintiffs filed the instant suit on March 20, 1991, charging, among other allegations, that:

(1) they were not informed by Defendants of the potential effect of the *Niagara Mohawk* decision on the sale and leaseback transaction;

(2) Defendants Tepco, Catalyst and Century made false representations of material facts related to the transaction; and

(3) San Diego intended to bring a regulatory challenge based on *Niagara Mohawk* but conspired with the other defendants not to bring its challenge until after the sale and leaseback transaction closed on December 31, 1986.

## DISCUSSION

### I. FEDERAL SECURITIES CLAIMS

The parties make essentially the same arguments made in the related *Philip Morris* case. In that case, this Court dismissed the Plaintiff's federal securities claims as time-barred following the United States Supreme Court's decisions in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, — U.S. —, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (upholding the one year/three year statute of limitations for § 10(b) and Rule 10b–5 claims), and *James B. Beam Distilling Co. v. Georgia*, — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (concerning retroactive application of new rules of decision in civil cases), and the Second Circuit's decision in *Welch v. Cadre Capital*, 946 F.2d 185 (2d Cir.1991) (holding that one year/three year limitations period by the Supreme Court in *Lampf* applies retroactively to all cases pending on direct review).

*Philip Morris* and the present case arise from the same set of facts, are based on almost the same allegations, and involve the same attorneys. Accordingly, for the reasons stated in *Philip Morris, supra,* the federal securities claims in this action are dismissed.

In *Philip Morris*, the absence of complete diversity between all plaintiffs and all defendants prevented this Court from accepting jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. Here, however, there is complete diversity of citizenship. Accordingly, Defendants' arguments related to the state law claims will be addressed.

### II. PERSONAL JURISDICTION OVER SAN DIEGO

San Diego argues that this Court lacks personal jurisdiction over it. In a motion

---

**6.** In accordance with its obligations under the New Power Sale Agreement, Tepco did not join either challenge.

to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff has the ultimate burden of establishing jurisdiction over the defendant by a preponderance of the evidence. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). However, at this stage of the litigation, when discovery has been stayed, Plaintiffs need only make out a *prima facie* case for jurisdiction through their pleadings and affidavits. *Cutco Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). Such pleadings and affidavits are to be construed in the light most favorable to the Plaintiffs, and all doubts must be resolved in the Plaintiffs' favor. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985).

Plaintiffs allege that this Court has personal jurisdiction over San Diego under New York Civil Practice Law & Rules ("CPLR") §§ 302(a)(2) and 302(a)(3).[7]

**A. CPLR § 302(a)(2)**

█ CPLR 302(a)(2) permits the exercise of jurisdiction over an out-of-state defendant who commits a tortious act within New York either in person or through an agent. Courts have defined "agent" broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators. *Lehigh Valley Indus., Inc. v. Birenbaum,* 389 F.Supp. 798, 806–7 (S.D.N.Y.1975), *aff'd,* 527 F.2d 87 (2d Cir.1975). It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2). *See e.g. Grosser v. Commodity Exchange, Inc.,* 639 F.Supp. 1293, 1308 (S.D.N.Y.1986), *Singer v. Bell,* 585 F.Supp. 300, 302 (S.D.N.Y.1984), *Soltex Polymer Corp. v.*

*Fortex Industries, Inc.,* 590 F.Supp. 1453, 1456–7 (E.D.N.Y.1984), *Dixon v. Mack,* 507 F.Supp. 345, 348–50 (S.D.N.Y.1980), *Socialist Workers Party v. Atty. Gen. of United States,* 375 F.Supp. 318, 321 (S.D.N.Y.1974).

█ "[T]he bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 93–94 (2d Cir. 1975). To establish jurisdiction on this basis, a plaintiff, must clear two hurdles: (1) it must make a *prima facie* factual showing of a conspiracy; and (2) it must allege specific facts warranting the inference that the defendant was a member of the conspiracy. *Singer v. Bell,* 585 F.Supp. at 303. *See also Dixon,* 507 F.Supp. at 348. Of course, the plaintiff must also show that the defendant's co-conspirator committed a tortious act in New York.

**1. *Prima facie* showing of conspiracy**

█ Plaintiffs allege that in early December 1986 representatives of San Diego informed Alamito representatives that San Diego was entitled to a rate reduction on the Alamito–San Diego Power Sale Agreement in light of the recently issued FERC opinion in *Niagara Mohawk.* San Diego told Alamito that it wanted to raise the issue with FERC before the consummation of the sale and leaseback agreement. Alamito representatives urged the San Diego representative to defer raising the challenge until after the transaction closed because bringing San Diego's intentions to the attention of the investors would likely "crater" the sale and leaseback transaction. Complaint ¶ 29.

Due to Alamito's reduced costs, San Diego stood to receive rate reductions of some

---

7. CPLR § 302 states in pertinent part:
 (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
 * * * * * *
 (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

(3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
 * * * * * *
(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...

$28 million if the transaction closed. San Diego stated to Alamito that it did not want to disrupt the proposed sale and leaseback and could hold off raising its challenge until after the closing, but it would pursue the matter thereafter. San Diego asked Alamito if it had informed the investors of the implications of the *Niagara Mohawk* decision, and Alamito indicated it had not. Alamito and San Diego then agreed not to tell the investors of San Diego's intention to assert its *Niagara Mohawk* claim and that San Diego would defer bringing its claim until after the transaction closed. San Diego proposed that Alamito "finesse its documents to our advantage now" in order to minimize the likelihood that the investors would learn of San Diego's intention before the closing. Alamito is alleged to have accepted San Diego's proposal. Complaint ¶ 30. Plaintiffs assert that these acts constitute a conspiracy to cause them to be defrauded when entering into the transaction, and that since San Diego was a conspirator in connection with a transaction which closed in New York, jurisdiction exists over San Diego.

To plead a valid cause of action for conspiracy under New York law, a plaintiff must allege the primary tort[8] and four elements:

 (a) a corrupt agreement between two or more persons,

 (b) an overt act in furtherance of the agreement,

 (c) the parties' intentional participation in the furtherance of a plan or purpose, and

(d) the resulting damage or injury.

*Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir.1986).[9]

a. Corrupt agreement

Plaintiffs' allege a corrupt agreement between San Diego and Alamito to defraud the investors, since they charge that (1) San Diego agreed to Alamito's suggestion that San Diego's intention to raise *Niagara Mohawk* challenge not be called to the attention of the investors until after the closing of the sale and leaseback transaction, and (2) San Diego suggested, and Alamito agreed, that Alamito would "finesse" its documents so that San Diego's intention to raise the challenge would not come to the attention of the investors causing the sale and leaseback to crater, but instead would allow the transaction would close. Complaint ¶ 30. It is this breach by Alamito of its duty of disclosure to the investors which allegedly prevented the "cratering" of the transaction, thereby producing substantial benefits for San Diego, Alamito, and the other defendants. Complaint ¶¶ 9, 30, 32. This allegation satisfies the first requirement under New York law that there be a corrupt agreement.

b. Overt act

The allegations satisfy the second requirement that there have been at least one overt act by one of the conspirators in furtherance of the unlawful plan. Plaintiffs allege that on December 29, 1986 Alamito delivered to the investors a "litigation" letter in which it updated its representations and warranties as to the status

---

**8.** It is well established that civil conspiracy is not an independent tort under New York law. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir.1981), *ABKCO Industries, Inc. v. Lennon*, 52 A.D.2d 435, 384 N.Y.S.2d 781, 783 (1st Dep't 1976). The charge of conspiracy is merely the string which serves to connect defendants to the actionable wrong and the overt acts which caused injury. *Kajtazi v. Kajtazi*, 488 F.Supp. 15, 21 (E.D.N.Y.1978), *citing Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir.1956), *cert. denied sub nom. Kaplow v. Reinfeld*, 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956).

**9.** Under New York law, a defendant may be held liable in tort for conspiracy "to do an

unlawful thing, or to do a lawful thing in an unlawful manner ..." *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir.1980), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980) (citations omitted). Generally, great latitude is allowed in setting out the particular acts from which the conspiracy is to be inferred. However, when the alleged purpose of the conspiracy is to defraud, the facts must be sufficiently stated that it can be determined whether or not there is fraud. *Suarez v. Underwood*, 103 Misc.2d 445, 426 N.Y.S.2d 208, 210 (N.Y.Sup. 1980). This requirement is similar to the requirement of Fed.R.Civ.P. 9(b) that fraud be pled with particularity.

of litigation and threatened litigation as required under the Participation Agreement. In that letter, Alamito purposely withheld mention of San Diego's intention to raise the *Niagara Mohawk* challenge. Complaint ¶ 31. The purpose of this omission, it is alleged, was to keep the investors in the dark as to San Diego's plan to "spring the *Niagara Mohawk* issue ... after the sale and leaseback had closed." Complaint ¶ 31.

### c. Intentional participation

The allegations satisfy the third requirement that San Diego and Alamito intentionally participated in the common plan to defraud. Plaintiffs' allegations charge that San Diego knowingly participated in an agreement with Alamito to mislead the investors, and San Diego knowingly assisted in its co-defendant's breach of duty to the investors for its own benefit.

### d. Damage or injury

Plaintiffs articulate their damages in part as the difference between the price the investors paid for the securities and the actual value of the securities received. Complaint at 33. They assert that because the risk that San Diego would bring a *Niagara Mohawk* challenge was undisclosed, the securities were sold at a price above their true value. In other words, had Plaintiffs known of San Diego's intended challenge, the securities would have been valued at a lesser price. As one court has noted, "Undisclosed potential liabilities, and the probability of litigation arising from such claims, reduce the value of a contemplated purchase." *Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 392 (S.D.N.Y.1988). Plaintiffs' pleadings sufficiently meet the fourth requirement in that the non-disclosure of San Diego's intentions had an impact on the price of the securities purchased.

As noted above, on the same day that San Diego filed its *Niagara Mohawk* challenge to the rates it was paying Alamito,

the ACC filed its challenge to the rates charged by Alamito to Tepco in the New Power Sale Agreement. It is alleged that the now challenged rates set in the New Power Sale Agreement were essential to the economic structure of the sale and leaseback transaction. Complaint ¶¶ 10–14, 17. The parties have directed much argument to whether San Diego's filing with FERC was the cause of the ACC's filing. For purposes of this motion, these arguments are not relevant. Here, Plaintiffs allege that because they did not know of San Diego's then existing intent to file its regulatory challenge, they were unable to appreciate the *risks* that might have resulted from San Diego's filing of its FERC challenge. Plaintiffs' claim is not predicated on the actual harms which stemmed directly from San Diego's filing with FERC. Rather, their allegation of injury is that the alleged fraud prevented them from properly assessing the risks involved in the transaction. It is a well established financial theory is that the price of a security is contingent upon the risks involved, all other things being equal. *In re Washington Public Power Supply System Secur. Litigation,* 650 F.Supp. 1346, 1352 n. 2 (W.D.Wash.1986), *aff'd.* 823 F.2d 1349 (9th Cir.1987).[10] Accordingly, Plaintiffs' allegation that the Defendants' fraud prevented them from fully considering the risks of the transaction is sufficient to state a claim for injury for purposes of making a *prima facie* claim of conspiracy to defraud.

Viewed in the light most favorable to the Plaintiffs, the allegations in the Complaint are sufficient to make out a *prima facie* case of conspiracy to defraud.

### 2. Relationship between San Diego and the alleged conspiracy

To establish jurisdiction under § 302(a), a plaintiff not only must allege a *prima facie* case of conspiracy, but also must show a sufficient relationship between the defendant and the conspiracy to warrant the inference that the defendant was a member

---

**10.** *See also* Modigliani & Pogue, *An Introduction to Risk and Return,* Financial Analyst's J., Mar.–Apr. 1974 & May–June 1974; William Sharpe,

*Capital Asset Prices: A Theory of Market Equilibrium Under Considerations of Risk,* J. of Finance 425 (1964).

of the conspiracy. A plaintiff need not show a formal agency relationship between the defendant and his co-conspirators. *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d at 90 n. 3. However, courts have required plaintiffs to show that:

(a) the defendant had an awareness of the effects in New York of its activity;

(b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and

(c) the co-conspirators acting in New York acted "at the direction or under the control," or "at the request of or on behalf of" the out-of-state defendant.

*Dixon v. Mack, supra,* 507 F.Supp. at 350. *See also Grove Press, Inc. v. Central Intelligence Agency,* 483 F.Supp. 132, 137–138 (S.D.N.Y.1980); *Clark v. United States,* 481 F.Supp. 1086, 1101 (S.D.N.Y.1979), *appeal dism'd* 624 F.2d 3 (2d Cir.1980); *Equipment Spare Parts, Ltd. v. World Wide Machinery Corp.,* No. 79 Civ. 5811 (S.D.N.Y. Aug. 1, 1980).

a. Awareness that activity had effects in New York

The Complaint and the affidavits filed in connection with this motion support the inference that San Diego had an awareness of the effects of its activity in New York. The affidavits indicate that there was a connection between the sale and leaseback transaction and New York. During 1986, when the transaction was negotiated and closed, US WEST maintained its principal place of business in New York City. Affidavit of Michael W. Dill, sworn to on May 20, 1991, ¶ 2. Mr. Michael Austin, Director of Cilcorp, states that numerous pre-closing negotiating sessions related to the transaction took place in New York City. The transaction closed in New York, and the warranties, covenants, and representations, as well as the securities themselves, were delivered in New York at the closing. Affidavit of Michael D. Austin, sworn to on May 21, 1991, ¶¶ 1–2.

There is evidence which suggests that San Diego was familiar with the transaction. Mr. Raymond McCann, the Lease Financing Manager of Philip Morris, states that San Diego was closely following the sale and leaseback transaction. He cites the testimony of San Diego's Supervisor of Power Contracts, given in proceedings before FERC, that San Diego kept apprised of the status of the sale and leaseback and even offered assistance when informed by Alamito that one of the major investors had withdrawn. Affidavit of Raymond S. McCann, sworn to on April 15, 1991, ¶ 8.[11]

The Complaint also alleges that San Diego was familiar with the sale and leaseback transaction. San Diego allegedly informed Alamito representatives that it intended to raise a challenge to the rates in the Alamito–San Diego Power Sale Agreement "before consummation of the sale and leaseback agreement." Complaint ¶ 29. Plaintiffs also allege that "San Diego asked [representatives of Alamito] if Alamito had informed the investors of the implications of *Niagara Mohawk* for the transaction." Complaint ¶ 30. Upon being informed that Alamito had not, San Diego and Alamito allegedly "agreed that San Diego's intention to assert its claim under the authority of that case would not be called to the attention of the Owner Participants and that San Diego would defer assertion of the claim until after the closing of the sale and leaseback." *Id.* As noted earlier, San Diego is alleged to have suggested the finessing of the documents related to the transaction. *Id.*

In light of the pleadings and affidavits, it is reasonable to infer that San Diego was familiar enough with the sale and leaseback transaction to know that its activities would have an effect in New York. San Diego allegedly followed the progress of the transaction closely such that it may well have known that a New York investor, US WEST, was involved or that the negotiations and closing were to take place in New York.

---

**11.** This affidavit was filed in connection with the related *Philip Morris* case. Plaintiffs have requested that this affidavit be made part of the record in this case, and that request is hereby granted. *See* Pl.Supp.Mem. at 19.

b. Benefit of the activity in New York

The requirement that the plaintiff show that the activity of the co-conspirator in New York was to the benefit of the out-of-state conspirator is also met. Plaintiffs allege, "If the proposed transaction were to close, San Diego would receive benefits of at least $28 million as a consequence of paying reduced rates to Alamito, which would flow from Alamito's reduced costs." Complaint ¶ 30. Thus, a conspiracy to defraud the investors in order to assure the sale and leaseback transaction closed directly benefited San Diego.

c. Exercise of discretion or control

The requirement that the out-of-state conspirator have exercised direction or control over the co-conspirators acting in New York, or that the co-conspirators in New York acted at the request of or on behalf of the out-of-state defendant, has been satisfied. As discussed above, Plaintiffs allege that San Diego suggested that Alamito "finesse its documents to our advantage now," and that Alamito agreed to do so. Complaint ¶ 30. The allegations, if true, show that it was San Diego who directed Alamito to draft its documents in a misleading fashion, thus assisting in the breach of duty toward and fraud on the investors by San Diego's co-defendants.

Accordingly, Plaintiffs' pleadings have met all the requirements for this Court to assert jurisdiction over San Diego under CPLR § 302(a)(2).

B. CPLR § 302(a)(3)

Because this Court finds that there is jurisdiction pursuant to § 302(a)(2), Plaintiffs' claims regarding CPLR § 302(a)(3) will not be addressed at length. Suffice it

to say that under the facts outlined, San Diego's alleged actions constitute a conspiracy to commit the tort of fraud outside New York which could reasonably have been expected to have consequences in New York, and San Diego's purchases of power from Alamito in interstate commerce enabled it to derive substantial revenues. Accordingly, this Court also has jurisdiction under CPLR 302(a)(3).

III. STATE LAW SECURITIES CLAIMS

■ Defendants move to dismiss Plaintiffs' state law securities claims on the ground that the form of the Plaintiffs' pleading is deficient.

In the same counts of the Complaint which charge violations of § 10(b) and Rule 10b–5, Plaintiffs also charge Defendants with a substantive violation of, conspiracy to violate, and aiding and abetting the violation of "Applicable State Securities Laws" of those states where the securities were offered or the offers were received, including Connecticut, Illinois, Iowa and Oregon. Complaint at 25, 27, 30. Defendants argue that Plaintiffs' failure to identify the specific statutory provisions under which they seek relief (1) fails to give notice of the claim in violation of Fed.R.Civ.P. 8, and (2) fails to plead fraud with the required particularity of Fed.R.Civ.P. 9(b).

Since all three counts are based on allegations of fraud in violation of state statutes, Fed.R.Civ.P. 9(b) requires Plaintiffs to indicate the state statutes under which they seek relief.[12] Because the Complaint fails to do so, those claims are dismissed.

IV. COMMON LAW FRAUD

■ Defendants move jointly pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) to dismiss

12. In *Denny v. Carey*, 72 F.R.D. 574, 579 (E.D.Pa.1976), the defendants had moved to dismiss the complaint pursuant to Rule 9(b) because it failed to indicate which specific statutory sections of the federal securities laws had allegedly been violated. The Court noted that, pursuant to an agreement reached at a pre-trial conference, defendants' counsel had received a letter from plaintiff's counsel which identified the appropriate statutory sections. The Court held that such notice was sufficient to comply with Rule 9(b).

The inference to be drawn from *Denny* is that had the plaintiff not given the defendants notice of the specific statutory provisions under which it sought relief, dismissal pursuant to Rule 9(b) may have been appropriate.

This Court prefers a more clear Court record of a plaintiffs fraud claims. The Plaintiffs have not indicated in any Court document under which state securities laws they seek relief. Accordingly, dismissal is appropriate.

Count VI of the Complaint which charges Century, Tepco, and Catalyst with common law fraud. "The elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–971 (2d Cir.1987). Defendants argue that (A) the Complaint fails to allege injury and causation, and (B) that the Complaint does not comply with the particularity requirement of Rule 9(b).

### A. Injury and causation

As stated in part II(A)(1)(d) of this opinion, Plaintiffs' allegations state that they were injured by Defendants' conduct.

### B. Rule 9(b)

Fed.R.Civ.P. 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and any other condition of mind of a person may be averred generally." Rule 9(b) is designed to further three goals: (1) to provide the defendant with fair notice of the plaintiff's claim, (2) to protect a defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike suits. *Di Vittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir.1987).

"To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

■ Plaintiffs' Complaint alleges that in Alamito's "litigation" letter of December 29, 1986, Alamito purposely made no reference to San Diego's belief that it was entitled to a reduction in rates under the Alamito–San Diego Power Sale Agreement or San Diego's stated intention, of which Alamito was well aware, to utilize the *Ni-*

*agara Mohawk* issue in proceedings before FERC after the sale and leaseback had closed. Complaint ¶ 31. Plaintiffs also allege that Tepco's Letter of Representation, Consent and Further Agreement, delivered on December 31, 1986 and dated as of December 15, 1986, did not disclose Tepco's knowledge of San Diego's intentions and instead gave representations and warranties to the contrary effect. Complaint ¶¶ 22, 23, 33. The Complaint states that Catalyst also knew of San Diego's intentions but did not disclose this knowledge in its Letter of Representation and Undertaking dated December 15, 1986 and delivered December 31, 1986. Complaint ¶¶ 24, 32.

These allegations indicate the nature of Plaintiffs' common law fraud claim with the specificity required by Rule 9(b) as interpreted by the Second Circuit in *Cosmas, supra.*

## V. UNJUST ENRICHMENT

■ Plaintiffs charge that Catalyst has been unjustly enriched at the expense of the investors. The Complaint states that upon execution of the Participation Agreement and receipt by Alamito of more than $700 million from the investors, Catalyst caused its subsidiary Alamito to transfer to Catalyst $120 million, in part as the repurchase price for Alamito common stock held by Catalyst and in part as a dividend thereon. Plaintiffs charge that this transfer was made without fair consideration and unjustly enriched Catalyst at the investors' expense. Complaint ¶ 68.

Plaintiffs rely on the proposition that when a party has been induced by fraud to enter into a contract, the other party has been unjustly enriched by the payments received under that contract, and accordingly holds those payments in constructive trust for the benefit of the defrauded party. Restatement of Restitution, §§ 160, 166, 168 (1937). Plaintiffs argue that because they were induced to enter into the Participation Agreement by fraud, Alamito was unjustly enriched at the investors' expense and held $700 million, including the transferred $120 million, in constructive trust for the benefit of the investors.

Thus, when Alamito's parent corporation Catalyst, with knowledge of the fraud, removed $120 million of the proceeds of the transaction by means of repurchase of stock and dividend payments, Catalyst took the $120 million subject to the constructive trust.

Defendants move to dismiss this unjust enrichment claim on the ground that, "Unjust enrichment is 'designed to prevent one person who has obtained a benefit from another *without entering into a contract with that person* from unjustly enriching himself at the other person's expense'.'". *Hartford Fire Insurance Co. v. Federated Department Stores, Inc.,* 723 F.Supp. 976 (S.D.N.Y.1989) (holding that where there is an express contract governing the subject matter of a transaction and that contract was not breached, a claim for unjust enrichment cannot lie) (emphasis added, citation omitted). Defendants argue that because the Participation Agreement governs the subject matter of this transaction, Plaintiffs claim for unjust enrichment must be dismissed.

■ Under New York law, "Unjust enrichment is a quasi-contract claim, and '[t]he existence of a *valid and enforceable* written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter.'" *Feigen v. Advance Capital Management Corp.,* 150 A.D.2d 281, 541 N.Y.S.2d 797 (1st Dep't 1989), *citing Clark–Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987) (emphasis added).

The Court in *Clark–Fitzpatrick* stated the applicable rule of law as follows:

> Where rescission of a contract is warranted, a party may timely rescind and seek recovery on the theory of quasi contract. It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agree-

ment, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.

521 N.Y.S.2d at 656, 516 N.E.2d at 193. As this case and *Feigen* indicate, when there is a valid contract governing a transaction, a party may not sue for unjust enrichment.

Here, however, Plaintiffs seek relief under several theories, including breach of warranty, breach of contract, and fraud. Because it has not yet been determined whether the investors were induced by fraud to enter into the Participation Agreement, there is no indication that the Participation Agreement is a *valid* express contract governing the transaction at issue. If it is determined that the Participation Agreement is void or may be voided for fraudulent inducement, then recovery under a theory of unjust enrichment may be proper. *Taylor & Jennings, Inc. v. Bellino Bros. Constr. Co.,* 106 A.D.2d 779, 483 N.Y.S.2d 813 (3d Dep't 1984). On the other hand, if the fraud allegations are dismissed or determined to be without merit, then unjust enrichment is not a valid theory of recovery. *See Hartford Fire, supra* (dismissing unjust enrichment claims after finding that a valid contract, not induced by fraud, governed the relations between the parties). At this stage of the proceedings, Plaintiffs' unjust enrichment claim cannot be dismissed on what is basically a factual issue.

## VI. FRAUDULENT CONVEYANCE

■ Based on the same allegations discussed in Part V of this opinion, Plaintiffs claim that the transfer of $120 million from Alamito to Catalyst was a fraudulent conveyance. The Uniform Fraudulent Conveyance Act ("UFCA"), as adopted by New York and Arizona,[13] provides that there are three elements to a claim for fraudulent conveyance:

(1) the transfer must be a "conveyance" within the meaning of the Act;

---

**13.** The parties do not dispute that the law of either New York or Arizona applies to this issue. The sale and leaseback transaction documents, which specifically referred to this transfer of the $120 million, were negotiated and executed in New York. Complaint, ¶ 15. Century is an Arizona corporation with its principal place of business in Arizona.

(2) the conveyance must be made "without fair consideration;"

(3) the conveyance must be made "by a person who is or hereby will be rendered insolvent."

N.Y. Debtor & Creditor L. § 270 *et seq.* (McKinney 1990), Ariz.Rev.Stat.Ann. § 44–1001 *et seq.* (West Supp.1990).

 First, it cannot be disputed that the transfer from Alamito to Catalyst was a "conveyance" within the meaning of the Act. N.Y. Debtor & Creditor Law § 270.

Second, Plaintiffs allege that Alamito's transfer of $120 million "was made without fair consideration." Complaint ¶ 68. Plaintiffs allege that the transfer was made in part as the repurchase price for Alamito common stock held by Catalyst and in part as payment of a dividend thereon. Complaint ¶ 68. Although a conveyance results in some realignment of equity interests among a parent corporation and its subsidiary, a trier of fact may still find that the conveyance, although for consideration, was not for fair consideration. The trier of fact must make its determination in light of all of the circumstances surrounding the conveyance. *See John Ownbey Co. v. Commissioner*, 645 F.2d 540, 545 (6th Cir.1981), *De Aragon v. Chase Manhattan Bank*, 457 F.2d 263, 266 (1st Cir.1972). Third, the Complaint adequately alleges that the transaction rendered the transferor insolvent. Under the terms of the UFCA:

A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

N.Y. Debtor & Creditor L. § 271. "Debt" includes "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* § 270.

The Complaint alleges that:

In light of the illiquid financial condition of Alamito, the uncertainties created by *Niagara Mohawk* decision and San Diego's claim and intention to rely on *Niagara Mohawk* to obtain a reduction in the price paid under its power supply agreement with Alamito, said transfer of $120 million rendered Alamito insolvent. In these circumstances, the then present fair salable value of Alamito's assets following the aforesaid transfer of funds was less than the amount that would be required to pay Alamito's probable liability on its existing debts as they became absolute and matured ...

Complaint ¶ 69. According to Plaintiffs, Alamito and Catalyst knew that San Diego intended to raise its challenge before FERC. Complaint ¶ 29. It may be inferred that there was a substantial likelihood that San Diego's challenge would result in a similar challenge to the rates in the New Power Sale Agreement. Based on these allegations, it cannot be concluded as a matter of law that the transfer of $120 million will not be found to have caused Alamito (Century) to thereby become insolvent.

Accordingly, Plaintiffs have stated a claim for fraudulent conveyance.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the claims related to violations of the federal securities laws is granted. San Diego's motion to dismiss the claims against it for lack of personal jurisdiction is denied. Defendants' motion to dismiss the common law fraud claim is denied. Defendants' motion to dismiss the state law securities claims is granted. Defendants' motion to dismiss the unjust enrichment claim is denied. Defendants' motion to dismiss the fraudulent conveyance claim is denied. The stay of discovery issued by this Court is hereby lifted.

All counsel are to attend a conference on Monday, November 25, 1991 at 9:00 a.m. in courtroom 302 to set a pre-trial schedule.

IT IS SO ORDERED.