320 F.Supp.2d 204 (2004)
In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION
Martin G. Wortham and Barbara Principe, Plaintiffs,
v.
Karstadtquelle AG, and Warenhaus Wertheim GmbH, Defendants.
Civil No. 02-3890(WGB).
United States District Court, D. New Jersey.
May 20, 2004.
*205 *206 *207 *208 Wechsler Harwood by Andrew D. Friedman, Esq., New York, NY, Osen & Associates, L.L.C. by Gary Osen, Esq., Oradell, NJ, for the Plaintiffs.
Wilmer, Cutler & Pickering by Roger M. Witten, Esq., New York, NY, Gibbons, Del Deo, Dolan, Griffinger & Vecchione P.C. by John J. Gibbons, Esq., Newark, NJ, for the Defendants.

OPINION
BASSLER, District Judge.
This action is before the Court as part of Multi-District Litigation Docket No. 1337, In re Holocaust Era German Industry, Bank, and Insurance Litigation. Plaintiffs Martin G. Wortham and Barbara Principe instituted the action in the Southern District of New York, Civil Action No. 01-2741(LAP), the district in which the alleged predecessors of the current defendant companies allegedly committed the tort of fraud in 1951 against Gunther Wortham (f/k/a Gunther Wertheim), the father of plaintiff Principe and grandfather of plaintiff Wortham. On the motion of defendants KarstadtQuelle AG ("Karstadt") and Warenhaus Wertheim GmbH ("Warenhaus Wertheim"), the Judicial Panel on Multi-District Litigation ("J.P.M.L.Panel") transferred the action to this Court for consolidated or coordinated pretrial proceedings because it appeared that the claims against these defendants, like those against German companies in the other actions that have been part of these J.P.M.L.-1337 proceedings to date, were (1) "connected to events arising out of Nazi rule in Germany", and (2) "linked to an important international agreement [that presents] significant common pretrial issues pertaining to the settlement or dismissal of the actions." See, In re Holocaust Era German Industry, Bank & Insurance Litigation, 2000 U.S. Dist. LEXIS 11650, Docket No. 1337 (J.P.M.L. Aug. 4, 2000); Id., Transfer Order (Aug. 8, 2002).
The defendants now move to dismiss the plaintiffs' Second Amended Complaint ("SAC") on several grounds, including lack of personal jurisdiction and various defenses under New York law. Defendants also interpose three defenses bearing directly on the issues within the scope of this J.P.M.L. docket: The political question doctrine, international comity, and the act of state doctrine. The plaintiffs cross-moved the Court for a suggestion of remand, but the Court denied plaintiffs' motion at a hearing on April 10, 2003 because whether remand is appropriate requires that the Court first assess whether the Court has jurisdiction over the defendants. For the following reasons, the defendants' motion to dismiss for lack of personal jurisdiction is granted. Because the Court does not have jurisdiction, it does not address defendants' additional defenses: the political question doctrine, international comity and act of state doctrine.

I. Factual & Procedural Background
The seventy-five page Second Amended Complaint ("SAC") filed in this action contains numerous factual allegations important to the ultimate success of plaintiffs' many claims. The Court reviews only those facts critical to its disposition of the issue of personal jurisdiction.[1]
Most other actions consolidated in this docket involved claims arising out of the actions of German industry during the Nazi Era. See, In re Nazi Era Cases Against German Defendants Litigation, 198 F.R.D. 429 (D.N.J.2000)(approving voluntary dismissal with prejudice of claims against German industry for injuries not *209 redressed by prior German restitution and compensation programs); In re Nazi Era Cases Against German Defendants Litigation, 129 F.Supp.2d 370 (D.N.J.2001)(dismissing slave labor claims against German company as presenting political questions and as barred by principles of international comity). The Court recommended that the J.P.M.D.L. Panel remand to the transferor district actions that involved claims that did not arise from the conduct of German industry during the Nazi Era. See, In re Nazi Era Cases Against German Defendants Litigation, 2002 WL 31454184 (D.N.J. June 5, 2002)(suggesting remand after voluntary dismissal of German defendants and only claims against Austrian defendants remained). Here, the plaintiffs allege that, unlike these other actions, their claims, although against German companies, arise not from the defendants' actions during the Nazi Era but from fraudulent and tortious conduct by the defendants' alleged predecessor companies or their agents and co-conspirators in 1951 and thereafter.

A. The Forced Sale of the Wertheim Family Holdings
Plaintiffs Barbara Principe and Martin G. Wortham are, respectively, a daughter and a grandson of the late Gunther Wortham. Gunther Wortham was the son of Franz and Kathe Wertheim, who, with his brothers Wilhem and Georg and other family members, owned and controlled more than twenty companies in Germany between 1875 and 1935. The family's principal company, Wertheim AG fur Handelsbeteiligungen was a holding company that operated department stores in Berlin. The Wertheim family also owned and controlled a real estate holding company, Wertheim Grundstucks-Gesellschaft GmbH. Wertheim AG fur Handelsbeteiligungen owned ninety-seven percent of the real estate holding company. Franz Wertheim owned one percent of the real estate holding company and approximately thirty-two percent of the Wertheim AG fur Handelsbeteiligungen capital stock prior to 1933. Upon Franz Wertheim's death in 1933, his wife Kathe inherited his real estate and stock holdings. (SAC ¶¶ 3, 47-52.)
In 1935, in accordance with the policies and laws of the Nazi Government of Germany, Kathe Wertheim was forced to sell approximately twenty percent of her shares in Wertheim AG fur Handelsbeteiligungen, subsequently known as AWAG Allgemeine Warenhandels-Gesellshaft AG ("AWAG") in 1938. Gunther Wertheim and his brother Fritz inherited the approximately twelve percent of the shares that remained upon their mother's death, but the brothers, too, were forced to sell those remaining shares in 1938 to a consortium of non-Jewish directors of AWAG led by Dr. Arthur Lindgens. Lindgens was at the time a non-Jewish family friend who eventually married Ursula Wertheim, the former wife of Georg Wertheim and mother of Georg's daughter Ursula. The other Wertheim family holdings in AWAG also were forcibly sold between 1934 and 1939. Gunther and Fritz Wertheim escaped Germany in 1939 and settled in the United States in 1942.
Post-war control of AWAG assets turned upon the location of those assets. The U.S. military authority, which controlled West Berlin following the war, concluded that AWAG was owned, in part, by Ursula Wertheim Froeb  a New York resident, United States citizen, and daughter of Georg Wertheim  and released control of AWAG assets in West Berlin on that basis. (Freidman Decl. Ex. 6, Property Control Record.) The Soviet Military Administration, however, refused to release AWAG assets in East Berlin. According to plaintiffs, AWAG property located in Soviet-controlled Berlin was expropriated and nationalized *210 without compensation on the ground that Nazi collaborators controlled the company. (SAC ¶ 75.)
In 1950, Gunther Wortham,[2] then a naturalized U.S. citizen living in New Jersey, together with his brother Fritz, filed a restitution claim with the Restitution Authority in West Berlin[3] seeking the return of the AWAG shares they had been forced to sell to the Lindgens-led consortium in 1938. According to plaintiffs, Lindgens had been actively involved in the control of AWAG since the 1938 forced sale. In 1951, because AWAG was suffering from a lack of liquidity, Lindgens approached AWAG competitor Hertie Waren-und Kaufhaus GmbH ("Hertie")[4] about purchasing a controlling share of the company. Thereafter, the alleged conspiracy to defraud the brothers of their restitution claims was entered into and carried out to preclude the Wertheim brothers and others with stock in or restitution claims against AWAG from discovering Hertie's interest in acquiring control of AWAG and thus its true market value.

B. The Alleged 1951 Fraud
Plaintiffs specifically allege that the fraud was perpetrated as follows: Hertie transferred money to a bank account to which AWAG had access, and AWAG, through Lindgens, used that money to acquire title to enough outstanding shares of the company that control could be, and was, sold to Hertie. (Friedman Decl. Exs. 18, 19.) AWAG acquired some of the shares necessary to effectuate this sale of control from Elsa Ziehm, the non-Jewish adopted daughter of Wilhelm Wertheim who had retained her stock in AWAG during the Nazi period. Lindgens convinced Ziehm, without informing her of the pending Hertie transaction, to sell to AWAG her 25% stake in the company for one-tenth the amount that Hertie subsequently paid AWAG to purchase those same shares. (SAC ¶ 88.) Lindgens then allegedly undertook two additional actions in furtherance of his conspiracy with Hertie in New York.
First, on August 12, 1951, Lindgens secretly negotiated a sales agreement in New York with Ursula Wertheim-Froeb and her husband whereby the Froebs, together with Lindgens, his wife, and Albrecht Wertheim, agreed to sell a 50.7% stake in AWAG to Hertie, its subsidiaries, and another individual associated with Hertie, Georg Karg ("the Secret Sales Agreement"). This so-called Secret Sales Agreement, which was handwritten, provided, inter alia, that Lindgens, his wife, and the Froebs would retain a 49% interest in AWAG; and the agreement purported to sell to Hertie shares from unspecified sellers including, according to plaintiffs, the shares against which the Wertheim brothers had filed restitution claims. (SAC ¶¶ 96-97.)
Second, on August 16, 1951, Lindgens met with the Wertheim brothers' lawyer in New York and proposed an agreement to settle the brothers' restitution claims against the owners of the shares they had been forced to sell the Lindgens consortium in 1938. Lindgens kept from the brothers all mention of the now secretly executed sale of control of AWAG to Hertie. Instead, Lindgens informed the brothers during the course of their negotiations *211 that most former AWAG properties were located in East Berlin and had been expropriated by the Soviets, what wasn't expropriated would soon close, that the company's future depended upon securing government-backed loans, and that the company's financial position was weak and so the future of the concern doubtful. (SAC ¶¶ 98-104.) The brothers then entered into a settlement agreement with Lindgens and the other persons in possession of the shares previously held by the Lindgens consortium for approximately $5100 ("the Settlement Agreement"), which plaintiffs allege was only 4% of the claims value at the time. (SAC ¶ 133.)
On October 24, 1951, AWAG granted Lindgens power of attorney to lead the negotiation of a merger with two Hertie companies, Hertie Vereinigte Kaufstatten GmbH, and Union Vereinigte Kaufstatten GmbH (collectively "Hertie"). (Friedman Supp. Decl. Ex. A.) On the same day, Hertie executed a second sales agreement ("October 1951 Agreement"). (SAC ¶ 140.) That agreement, plaintiffs allege, rendered the earlier, Secret Sales Agreement operative because the October agreement incorporated by reference the terms of the Agreement with minimal changes. (Friedman Decl. Ex. 18)("The parties named in I[sic] have prepared a written agreement dated August 12, 1951.") Hertie's alleged bank, Bankhaus Alwin Steffan, was a party to the October Agreement. Plaintiffs allege that neither the Secret Sales Agreement nor the October 1951 Sales Agreement are found in the Handels register in Berlin where the Wertheim Corporation's records are held, and thus public record did not exist of Hertie's acquisition of the company in 1951. (SAC ¶ 144; Druba Decl. ¶ 9). On October 28, 1951, Lindgens then advised the Wertheim brothers' attorney in New York by letter that the amount Lindgens had agreed to pay the brothers in settlement of their restitution claims "has been paid to Bankhaus Alwin Steffan, Frankfurt a.M., Neue Mainzer Str. 55." (Friedman Decl. Ex. 19.)
On November 7, 1951, representatives of the Wertheim brothers and Lindgens filed the Settlement Agreement with the Restitution Authority in West Berlin. The Wertheim brothers thereby abandoned their claims for restitution based upon the aryanized shares of AWAG. Ten days later, plaintiffs allege, Lindgens, acting under power of attorney for AWAG, finalized the secret transaction with Hertie with an agreement changing the by-laws of the company to suit Hertie and changing the company name from AWAG to Wertheim Grundstucks GmbH, which eventually became the defendant company Warenhaus Wertheim. (Freidman Decl. E's. 20, 25 at p. 27.)

C. Post-1951 Developments
The plaintiffs further allege that defendants engaged in conduct after 1951 concealing and perpetuating the original 1951 fraud. Those claims include the defendants relatively recent actions with respect to real property located in and around the Potsdamer Platz in Berlin.[5] In 1988, defendant Warenhaus Wertheim sought and obtained from the Federal Republic of Germany legal title to parcels of land totaling approximately five acres that had been owned by AWAG prior to World War II and was expropriated by the Soviets following the war. The land, although located in or near the part of the square west *212 of the Berlin Wall, was legally part of East Germany until a 1987-1988 border adjustment between the East and West German governments returned the land to West Germany. It is alleged that defendant Warenhaus Wertheim, despite its knowledge of the 1951 fraud, persuaded the West German government that Warenhaus Wertheim was the legal successor to AWAG, the owner from whom the land at issue had been expropriated. (SAC ¶¶ 171-180.) Title was conveyed to Warenhaus Wertheim on that basis, apparently in 1990, after German reunification. (SAC ¶¶ 177-180.)
Plaintiffs further allege that, following the passage of the 1990-92 Eastern Restitution Laws, the defendants sought restitution for the properties that AWAG and Wertheim family members allegedly owned prior to World War II and the subsequent expropriation of the property by the Soviets. According to plaintiffs, after the German High Court ruled that defendants, as corporations, could not receive restitution for the properties under the applicable laws, the defendants claimed to stand in the position of the original Wertheim heirs as well as AWAG (SAC ¶¶ 182-190.) The Conference on Jewish Material Claims Against Germany, Inc. ("JCC"), an organization authorized under the New Restitution Laws to serve as a residual beneficiary of unclaimed or heirless Jewish property in East Germany, became involved in 1992 when it filed claims with the Restitution Authority for the properties formerly owned by AWAG. By plaintiffs own admission, the Potsdamer Platz properties were given "considerable scrutiny by the Land Berlin, the Berlin Restitution Authority, the German Finance Ministry and several courts." (SAC ¶¶ 207, 212). Plaintiffs contend that, throughout these proceedings, the defendants concealed the 1951 Secret Sales Agreement from these German governmental entities as those entities rendered decisions with respect to the properties.
Karstadt acquired Hertie and its Warenhaus Wertheim subsidiary in 1994, and plaintiffs allege that Karstadt continued to conceal the 1951 fraud after the acquisition. (SAC ¶¶ 214-16.) In 2000, Karstadt sold the Potsdamer Platz properties. (SAC ¶ 217.) The most recent alleged action by Karstadt in furtherance of the fraud was a letter dated February 1, 2001 from Karstadt's counsel to plaintiffs' counsel denying liability to the plaintiffs by reason of the 1951 Settlement Agreement entered in the Restitution Authority. (SAC ¶¶ 220-21.) Karstadt sent the letter in response to an inquiry from plaintiffs' counsel, and plaintiffs allege that several statements made in the letter were false and misleading. For example, Karstadt stated Warenhaus Wertheim owned the Potsdamer Platz properties before the reunification of Germany, but plaintiffs contend that Land Berlin transferred ownership to Warenhaus Wertheim in 1991. (SAC ¶ 222.) And Karstadt stated that AWAG or its subsidiaries had owned the Potsdamer Platz properties in 1951 while plaintiffs proffer land registry records showing otherwise. (SAC ¶ 123.)

II. Procedural Background
Again, the plaintiffs are the daughter and grandson of Franz Wertheim and residents of New Jersey and Illinois, respectively. Based upon the above discussed facts, the plaintiffs sued the defendants and the Estate of Dr. Arthur Lindgens[6] in the Southern District of New York on fourteen counts in the Spring of 2001. The defendants moved to dismiss the complaint, but the defendants also moved before *213 the J.P.M.L. Panel for transfer of the action to this Court for consolidated and coordinated proceedings with J.P.M.L. Docket No. 1337. The J.P.M.L. Panel granted defendants' motion, rejected plaintiffs' opposition to transfer, and transferred the action on August 8, 2002 because the Panel concluded that this action was similar to actions that "(i)involved common allegations to events arising out of Nazi rule in Germany, (ii)were linked to an important international diplomatic agreement between the United States and the Federal Republic of Germany, and (iii)promised to present significant common factual and legal issues pertaining to threshold jurisdictional questions and/or the settlement and dismissal of the actions pursuant to the terms of the international agreement." (J.P.M.L Docket No. 1337, Transfer Order, Aug. 8, 2002). The Panel noted that "a threshold issue appears to exist in Wortham regarding which defendants, if any, are to be construed as German entities as that term is defined in the international agreement." (Id.)
The Second Amended Complaint, now the operative complaint, alleges fourteen counts against defendants KarstadtQuelle AG and Warenhaus Wertheim GmbH. Seven counts seek damages for the alleged 1951 fraud perpetrated in New York by Dr. Lindgens as an alleged co-conspirator with Warenhaus Wertheim's alleged predecessor AWAG and Karstadt's alleged predecessor Hertie, including: fraud (Count 1), negligence (Count 2), aiding and abetting fraud (Count 3), conversion of personal property (Count 4), breach of fiduciary duties (Count 7), aiding and abetting breaches of fiduciary duties (Count 8), and tortious injury to personal property (Count 9). Plaintiff also seeks imposition of a constructive trust (Count 14). Two counts seek to recover for defendants' alleged unjust enrichment in obtaining West German assets (Count 5) and fraudulent acquisition of real property in West Berlin (Count 11) during the 1990s. The remaining four counts challenge the defendants' acquisition of title to properties in East Berlin after the reunification of Germany, including: unjust enrichment in obtaining the Potsdamer Platz properties (Count 6), fraudulent concealment relating to real property in East Germany (Count 10), fraudulent acquisition of real property on Potsdamer Platz (Count 12), and unjust enrichment and unconscionability of the defendants' acquisition of real property on Potsdamer Platz (Count 13).
Defendants Karstadt and Warenhaus Wertheim move to dismiss on a number of grounds, including lack of personal jurisdiction, political question doctrine, principles of international comity, the act of state doctrine, and failure to state a claim. The Court addresses only the issue of personal jurisdiction because it is dispositive.

III. Personal Jurisdiction

A. Applicable Standard and Burden of Proof on 12(b)(2) Motion
Statutory and constitutional standards limit the Court's exercise of personal jurisdiction over the defendants. Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 293 (3d Cir.1985). A federal court may exercise personal jurisdiction over a non-resident of the state in which the court sits to the extent authorized by the law of the state in which it sits. Fed.R.Civ.P. 4(e); Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 145 (3d Cir.1992). The Due Process clause of the Fourteenth Amendment to the U.S. Constitution, in turn, permits the Court's exercise of personal jurisdiction over a non-resident defendant only if there exist sufficient "minimum contacts" between the defendant and the forum state such that the maintenance of the suit in that state does not "offend traditional notions of fair play and substantial *214 justice." International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Asahi Metal Ind. Co. v. Superior Court, 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).
Due process analysis is a two-step inquiry; the Court asks first whether the plaintiff has shown minimum contacts with the forum and then whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. The plaintiff bears the burden of showing that the defendant's contacts with the forum are sufficient for the Court's exercise of personal jurisdiction over that defendant. Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir.1987); Gehling v. St. George's School of Medicine, Ltd., 773 F.2d 539, 542 (3d Cir.1985). Plaintiffs must show contacts sufficient to allow the Court to exercise either specific or general jurisdiction over the defendant. Id.; Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
Because this action is a diversity action, the substantive law of the transferor forum, New York, controls the analysis of pre-trial issues involving state law, including the defense that the court lacks personal jurisdiction over the defendants. See Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Accordingly, plaintiffs must show that the Court may exercise jurisdiction pursuant to New York law in the first instance. The law of the transferee forum applies, however, to federal questions, though the Court may give the law of the transferor forum "close consideration." See, In re Korean Air Lines Disaster, 829 F.2d 1171 (D.C.Cir.1987); In re Donald Trump Casino Securities Litigation, 7 F.3d 357, 368 n. 8 (assuming without deciding that law of the transferee district controls federal questions but law of transferor district merits "close consideration"); In re Nazi Era Cases Against German Defendants, 198 F.R.D. 429, 439 (D.N.J.2000)(applying law of transferee district to interpret and apply Fed.R.Civ.P. 23(e)).
Once a defendant asserts the defense of lack of personal jurisdiction, the plaintiff bears the burden of establishing by a preponderance of the evidence facts sufficient to support the Court's exercise of personal jurisdiction over the defendant. Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir.1992); Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir.1999). The nature of plaintiffs' obligation to meet this burden at different stages of the litigation, however, differs between fora. In this forum, a court will not dismiss an action prior to discovery for lack of personal jurisdiction unless the claims asserted are "clearly frivolous." Massachusetts School of Law at Andover, Inc. v. American Bar Assoc., 107 F.3d 1026, 1041 (3d Cir.1997). At that pre-discovery stage, courts in this district should permit plaintiffs to proceed with jurisdictional discovery if they present their allegations with "reasonable particularly suggesting facts may exist that will support the exercise of personal jurisdiction over the defendants." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir.2003); Provident Nat'l Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir.1987). But ultimately plaintiffs may not rely on bare pleadings alone. Instead, plaintiffs must sustain their burden through "sworn affidavits or other competent evidence." See e.g., Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n. 9 (3d Cir.1984); International Ass'n of Machinists & Aerospace Workers *215 v. Northwest Airlines, 673 F.2d 700 (3d Cir.1982). The Court still accepts the allegations of the complaint as true, but plaintiffs must proffer competent evidence of jurisdictional facts to meet their burden on a 12(b)(2) motion. See, IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 257 (3d Cir.1998); Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir.1996).
In the transferor forum, the nature of plaintiffs' obligation differs when plaintiffs have taken jurisdictional discovery (as here) but no hearing has been held. The Second Circuit distinguishes 12(b)(2) motions, on which courts assume the truth of a plaintiff's factual allegations and evaluates merely the sufficiency of those allegations, from summary judgment motions, on which courts determine whether undisputed facts show jurisdiction lacking, from "an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of a trial on the merits," at which plaintiffs must establish jurisdiction by a preponderance of the evidence. Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.1990). Thus, in the Second Circuit, a defendant in effect demurs by filing a 12(b)(2) motion, and "a plaintiff need only persuade the court that its factual allegations constitute prima facie showing of jurisdiction." Id. at 197. Plaintiffs make a prima facie showing of jurisdiction in the Second Circuit if they proffer "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." Id.
The defendants sought transfer on two grounds: the purported common questions of fact with the actions previously transferred to this Court and the link between plaintiffs' claims and the July 17, 2000 Agreement between the Government of the Federal Republic of Germany and the Government of the United States of America concerning the Foundation "Remembrance, Responsibility, and the Future" (the "Foundation Agreement"). (March 15, 2002 Ltr. to Clerk of J.P.M.L. Panel from Karstadt Counsel.)
Defendants correctly argue (Tr. 26-36.) that the threshold issue which the court must first address is whether the court has personal jurisdiction. See, Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (rejecting notion of "hypothetical jurisdiction"), Ruhrgas AG v. Marathon Oil Company, 526 U.S. 574, 585, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)(recognizing court's option"to choose among threshold grounds for denying audience to a case on the merits."), Arrowsmith v. United Press International, 320 F.2d 219, 221-23 (2d Cir.1963)("logic compel[s] considering jurisdiction and venue questions first." The more controversial political question and international comity issues can be avoided, contend the defendants, because the statutory standards, due process minimum contacts and reasonableness standards require dismissal.) (Tr. 36.) The parties agree that the factual materials now before the Court allow the Court to decide whether plaintiff has made a prima facie showing of personal jurisdiction over each defendant based upon competent evidence.
Therefore, the Court will examine whether the plaintiffs have made a prima facie showing of personal jurisdiction.

B. Plaintiffs' Prima Facie Case for Personal Jurisdiction Under New York Law
Turning, then, to whether plaintiffs have made the requisite showing, the Court first assesses whether plaintiffs have shown that the laws of New York permit the exercise of jurisdiction over the defendants. See, In re Agent Orange Product Liability Litigation, 818 F.2d 145, 163 (2d Cir.1987). Plaintiffs argue that personal *216 jurisdiction over the defendants is proper either under a theory of general jurisdiction pursuant to N.Y. Civ. Prac. L. & R § 301 (McKinney 1990)("CPLR") or a theory of specific jurisdiction under New York's long-arm statute, CPLR § 302. The Court then must address the defendants' argument that the exercise of jurisdiction fails to "comport with traditional notions of fair play and substantial justice."

1. General Jurisdiction: Doing Business Within the Forum
The plaintiffs' evidence does not establish a prima facie showing of general jurisdiction under CPLR § 301. Under New York law, courts may exercise general jurisdiction over foreign corporations if they establish a presence in the state by "doing business" there. Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.2000). Under CPLR § 301, "a court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." New York courts interpret "doing business" for the purpose of CPLR § 301 as "continuous and systematic course of doing business as to warrant a finding of presence in this jurisdiction .... not occasionally or casually, but with a fair measure of permanence and continuity." Landoil Resources Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir.1990) (citations omitted); see also, Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915 (1917). Significantly, "doing business" means primarily the activity of selling goods and services, and not the activity of merely purchasing goods or services. See e.g., Dardana Ltd. v. A.O. Yuganskneftegaz, 2001 WL 1131987, at *3 (S.D.N.Y. Sept.24, 2001) (citing L.G. Adam Textiles, Ltd. v. Today's Man, Inc., 190 U.S. Dist. LEXIS 13983, *8 (S.D.N.Y. Oct. 1, 1980)).
New York courts have focused on the following indicia of presence: the existence of an office, the solicitation of business, the presence of bank accounts or other property, and the presence of employees or agents in New York. Landoil, 918 F.2d at 1044. Further, courts require the foreign corporation present and doing business at the time the action was commenced; prospective business activities in New York are insufficient for jurisdiction purposes. Lancaster v. Colonial Motor Freight Line, Inc., 177 A.D.2d 152, 581 N.Y.S.2d 283(1992); Bakery Salvage Corp. v. Maple Leaf Foods, 195 A.D.2d 954, 600 N.Y.S.2d 874 (1993). Often courts apply a "solicitation plus" test in which they will exercise general jurisdiction only if solicitation of business is "substantial and continuous, and defendants engage in other activities of substance in the state." Landoil, 918 F.2d at 1043-44.
Under its interpretation of New York law, the Second Circuit sustained a finding of a lack of jurisdiction even though the company's various employees made in the aggregate thirteen trips to New York. Id. at 1045. Although these trips to service New York clients of the company's insurance policies constituted "substantial and continuous" solicitation of business in the state, the Second Circuit found the nature of those trips to weigh against exercising jurisdiction. Id. Absent other indicia of presence these business trips were "short in duration, were by different employees, and involved a number of different accounts.... Moreover, these solicitations occurred sporadically over a period of eighteen months." Id. The court concluded CPLR § 301 required more than sporadic presence in the forum. Id. at 1046.
At this preliminary stage, while the court must resolve disputed facts in the light most favorable to plaintiffs, conclusory allegations by plaintiffs are not sufficient *217 to establish a prima facie showing of general jurisdiction. Dardana Ltd., 2001 WL 1131987, at *3 (S.D.N.Y. Sept.24, 2001); see also, Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir.1998). There must at least be facts upon which to predicate general jurisdiction. There are none here.

a. General Jurisdiction over KarstadtQuelle AG
In the present case, plaintiffs argue generally that Karstadt "solicits and transacts business in the Southern District of New York by and on behalf of its wholly own subsidiaries, who purchase and sell goods in New York." (SAC ¶ 30; Def. Answers to First Interrogs. No. 17.) Specifically, plaintiffs assert that Karstadt has retained legal services with a New York law firm to secure domain names and to protect its trademarks for Karstadt and several of its subsidiaries. (Def. Answers to First Interrog. No. 17.) Plaintiffs argue that Karstadt has a "contractual relationship with the [New York-based] financial firm Bloomberg." (Id. at No. 7.) Also, plaintiffs imply Karstadt's main website solicits business in New York. (Id. at No. 1 ¶ ¶ 2, 3, 8.)
This Court agrees with the defendants that these "transactions" do not rise to the level of "doing business" for the purposes of CPLR § 301. The plaintiffs have not refuted the facts that (1) Karstadt is not registered to do business in New York, (2) does not have any offices, real estate, or bank accounts in New York, (3) does not directly sell any products in or provide any services in New York, (4) does not advertise any products or services in or otherwise solicit business in New York, and (5) does not have any employees or agents in New York. (Kreuz Suppl. Decl. ¶ 2).
Further, the "business" contemplated under CPLR § 301 and the New York courts is primarily the activity of "selling" and not "buying," which is not the case here. Dardana Ltd. v. A.O. Yuganskneftgaz, 2001 WL 1131987, at *3 (S.D.N.Y. Sept.24, 2001) (finding insufficient for jurisdictional purposes the fact that the defendant was a client of a New York-based company providing financial investment and legal advice). Examples of "selling" include the selling of goods, maintaining a sales office, employing sales representatives, advertising, and soliciting business. Id. New York courts acknowledge that the activity of selling goods involve greater contacts within the forum, such as registering to do business, paying corporate income taxes, than do buying activities. See, L.G. Adam Textiles, Ltd., 1980 U.S. Dist. LEXIS 13983 at * 3.
As a holding company, Karstadt does not directly sell any goods in New York. (Kreuz Suppl. Decl. ¶ 2.) The record provides two business transactions by the parent company Karstadt for purchases of investment and legal services. First, Karstadt has a "contractual relationship" with the financial information firm Bloomberg the total value of which was DM 0 in 2000 and DM 50,000 (approximately $25,000) in 2001. (Def. Answers to First Interrogs. No. 7.) Second, the record shows that Karstadt retained legal services with a New York law firm to assist "from time to time" with trademark issues and internet domain name acquisitions for three of its subsidiaries' websites, namely WOM.com, MyWorld.com, and tradeoberserver.com. (Id. at No. 17.) The total value of legal services in 2000 was $10,000 and in 2001 $12,000. (Id.) Even if purchases could be considered "doing business," such mere occasional purchases between Karstadt and the State of New York fall well below the threshold level warranting jurisdiction under CPLR § 301.
Consequently, absent any indicia of presence or the extent and frequency of *218 solicitation of business for the purpose of selling goods or services, this court cannot exercise general jurisdiction over Karstadt. Furthermore, even under the "solicitation plus" test, plaintiffs would still have to show that "the solicitation is substantial and continuous, and [that] defendant engages in other activities of substance in the state...." Landoil, 918 F.2d at 1044. Purchases of investment and legal services in New York do not rise to the level of substantial activity or even doing business within the meaning of CPLR § 301 unless Karstadt had also established a formal office or other presence within the state. Id. at 1044-45. Also, these transactions cannot be discerned as continuous, permanent and substantial. Id. at 1043. Therefore, plaintiffs have failed to adduce competent evidence of Karstadt's transactions with the forum that would permit the exercise of general jurisdiction.

b. General Jurisdiction under Parent-Subsidiary Relationship
Although Karstadt is not doing business in New York, plaintiffs attempt to exercise jurisdiction over Karstadt through its subsidiaries. Under New York law, a foreign corporation need not necessarily be doing business itself in the forum state to confer jurisdiction. In certain circumstances, "jurisdiction has been predicated upon activities performed in New York for a foreign corporation by an agent." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.2000). But the presence of a subsidiary in New York alone does not subject a foreign parent company to New York jurisdiction, rather courts require that the foreign corporation is "doing business in New York vicariously through the activity of a closely-affiliated company." Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir.1984) (citing Delagi v. Volkswagenwerk A.G., 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972)).
New York courts recognize two theories from which actions of a subsidiary may be found to be attributed to its parent for jurisdictional purposes: (1) if the subsidiary acts as its agent; or (2) if the subsidiary is a "mere department" of its parent. See e.g., Frummer v. Hilton Hotels Int'l Inc., 19 N.Y.2d 533, 537-38, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967) (agent theory); Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd., 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965) (mere department theory). A court may assert jurisdiction over a foreign corporation when "it affiliates itself with a New York representative entity" that "renders [sufficiently important] services on behalf of the foreign corporation" that the foreign corporation would have to perform itself. Wiwa, 226 F.3d at 95.
The difficulty with plaintiffs' argument is that none of Karstadt's subsidiaries are themselves doing business in New York sufficient to assert general jurisdiction over them. Since the subsidiaries are not doing any business in New York, there is no activity that can be attributed to Karstadt.
Karstadt has four wholly owned subsidiaries: Karstadt Warenhaus AG, Quelle, Neckerman Versand AG and Warenhaus Wertheim. (See Defs' Ans. to First Interrogs.) Plaintiffs contend that two of these subsidiaries, Neckerman Versand AG and Karstadt Warenhaus AG are doing business in New York, but the plaintiffs fail to provide fact-specific jurisdictional allegations that rise to the level of "doing business" within the meaning of CPLR § 301. Plaintiffs' argument rests upon purchases by Karstadt Warenhaus AG and Neckermann Versand AG of substantial goods and services in New York since the commencement of this action. (Defs' Ans. to First Interrog. No. 7.) For example, Karstadt Warenhaus AG purchased approximately *219 $1,300,000 in goods and services in New York since 2000, and Neckermann Versand AG has an "ongoing business relationship" with a New York company to purchase textiles. Id. In 2001, Neckermann Versand AG purchased approximately $800,000 worth of textiles and employed a New York modeling agency paying approximately $170,000. Id. However such occasional purchases do not constitute "doing business" under CPLR § 301 general jurisdiction. See, e.g., Laufer, 55 N.Y.2d at 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (holding multiple business trips for purchases in New York does not rise to the level of continuous or systematic activity); L.G. Adams Textiles, 1980 U.S. Dist. LEXIS 13983 at * 8 (same).
Even if Neckerman Versand AG and Karstadt Warenhaus AG could be deemed to be doing business, the evidence would not support jurisdiction over Karstadt under the theory that they were mere departments of Karstadt. In determining whether a subsidiary functions as a "mere department" of a parent, courts consider four factors: (1) common ownership, (2) financial dependency of the subsidiary on the parent, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. E.g., Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir.1998). Common ownership is the "essential" factor, while the other factors are important. Volkswagenwerk, 751 F.2d at 120.
Plaintiffs' factual allegations show only that Karstadt made broad decisions for its subsidiaries. (Schenck Deposition ¶ 69 (parent providing general controls for liquidity purposes)). Although plaintiffs argue also that two officers of parent company are also part of management of its subsidiaries (Kreuz Suppl. Decl. ¶ 1), plaintiffs fail to provide facts that this overlap indicates unusual parental control. J.L.B. Equities, Inc., 131 F.Supp.2d at 550 (holding overlap of officers alone is not determinative of parental control); see also, Jazini, 148 F.3d at 185 (same). Without more, these facts do not exceed the inherent control in a parent-subsidiary relationship to confer general jurisdiction.
Nor is there evidence that Neckermann Versand AG and Karstadt AG Warenhaus acted as agents of Karstadt in New York. For a showing of agency, plaintiffs must show that the subsidiary "does all the business which [the foreign parent] could do were it here by its own officials." Jazini, 148 F.3d. at 184 (citing Frummer, 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851). New York courts require a subsidiary to render services "sufficiently important to the [parent company] that the corporation itself would perform equivalent services if no agent were available." Wiwa v. Royal Dutch Petroleum Co. 226 F.3d 88, 95 (2d Cir.2000)(citing Frummer, 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851).
In the this case, there are no facts on record to show that the subsidiaries engage in business in New York on behalf of Karstadt. Plaintiffs proffer contracts between Karstadt and two of its subsidiaries that conduct business in New York as evidence of Karstadt's contacts with the forum. According to plaintiffs, the contracts show that Karstadt received income from its subsidiaries' New York activities. The defendants dispute plaintiff's characterization of the contracts, but, regardless, the contracts cover a period beginning after plaintiffs filed their action in New York. (Druba Decl. ¶ 6.) Plaintiffs argue that because Neckermann Versand AG and Karstadt Warenhaus AG, purchase goods in New York periodically (Defs' Ans. *220 to First Interrogs. No. 7, 17.), they act as Karstadt's agents. However, this is insufficient to conclude that Karstadt would have performed similar transactions if no agent/subsidiary were available as is required under the agency analysis. Indeed, as a holding company, it is unclear how Karstadt has use for the textiles and modeling agency services from Neckermann Versand, for example. (Defs' Ans. to First Interrogs. No. 7.)
Plaintiffs also seek to impose jurisdiction based on Karstadt's website. Karstadt's website serves as a shopping "portal" that allows customers in New York to transact business with and purchase goods from Karstadt's subsidiaries. (SAC ¶¶ 31-22.)[7] The main website does not offer internet shopping capabilities from Karstadt itself, but rather only links to its subsidiaries with shopping portal capabilities. (Kreuz Suppl. Decl. ¶ 2.) For example World of Music Productions ("WOM") is a wholly-owned subsidiary of Karstadt Warenhaus AG, which in turn is a wholly-owned subsidiary of Karstadt. (Defs' Ans. to First Interrogs. No. 1.) The fact that Karstadt's website has the potential to link New York customers to its sub-subsidiary WOM from which customers can purchase goods is too attenuated to show that Karstadt solicits business in New York. Furthermore, a parent company's website is insufficient to confer jurisdiction under CPLR § 301. Spencer Trask Ventures, Inc. v. Archos, S.A., 2002 WL 417192 *6 (S.D.N.Y. March 18, 2002) (Preska, J.) ("the fact that a foreign corporation has a website accessible to New York is insufficient to confer jurisdiction under CPLR § 301."). Schultz v. Ocean Classroom Foundation, Inc., 2004 WL 488322, *6 (S.D.N.Y. Mar.15, 2004)(citing Spencer Trask Ventures, Inc. v. Archos S.A., 2002 WL 417192 (S.D.N.Y. March 18, 2002)).

c. General Jurisdiction over subsidiary Warenhaus Wertheim
Plaintiffs allege no facts and offer no competent evidence showing that defendant Warenhaus Wertheim is subject to the general jurisdiction of New York courts pursuant to Section 301. Plaintiffs' factual allegations primarily relate to parent company Karstadt's activities within New York on its own or through its subsidiaries Karstadt Warenhaus and Neckermann Versand AG. In fact, plaintiffs fail to allege Warenhaus Wertheim transacts any business in New York. (See, SAC ¶¶ 34-41.) At most, plaintiffs argue that Karstadt's business structure enables its subsidiaries to house other subsidiaries within its business to warrant exercising jurisdiction over Warenhaus Wertheim AG. (Schenk Deposition ¶¶ 64-66.) Specifically, plaintiffs assert that Karstadt operates a travel agency using the brand name "Wertheim" within department stores owned by Warenhaus Wertheim AG to impute general jurisdiction over Warenhaus Wertheim. (SAC ¶¶ 40-41.) Without more, this is far below the jurisdictional threshold for "doing business" within the forum.
Plaintiffs fail to show continuous and systematic solicitation to warrant exercising general jurisdiction over subsidiary Warenhaus Wertheim. The mere fact that Warenhaus Wertheim is a wholly owned subsidiary of Karstadt, even with allegations of primary control (which is not shown from the record), is insufficient to impute general jurisdiction without some allegations of substantial business in New York. Consequently, plaintiffs' evidence *221 does not establish a prima facie showing of general jurisdiction under CPLR § 301 over the defendant Warenhaus Wertheim.

2. Jurisdiction Premised Upon Tortious Act in New York
Plaintiffs primarily rely upon CPLR § 302(a)(2) to support the Court's exercise of personal jurisdiction over the defendants Karstadt and Warenhaus Wertheim. The argument is not that Karstadt and Warenhaus Wertheim themselves committed a tort in New York giving rise to jurisdiction, but that because Karstadt and Warenhaus Wertheim are successor corporations to Hertie and AWAG the conduct of Lindgens as agent for Hertie (and AWAG) can be attributed to Karstadt and Warenhaus Wertheim and serve as the predicate for "long-arm" jurisdiction over these defendants today.
Passing for the moment whether Karstadt and Warenhaus Wertheim can in any meaningful sense be considered as successor corporations, the Court will first determine whether the plaintiffs have established that Lindgens as Hertie's and AWAG's agent committed a tort in New York. Then, the Court will determine whether acts of Lindgens and Hertie/AWAG (which are no longer in existence) can be attributed to Karstadt and Warenhaus Wertheim for jurisdictional purposes under New York law. Finally, the Court will evaluate whether the assertion of jurisdiction over these foreign defendants contravenes the due process clause of the Fourteenth Amendment. CPLR § 302(a), the relevant text of which is set forth in the margin, authorizes the exercise of personal jurisdiction over an out-of-state defendant who "in person or through an agent" (1) transacts business within the state, (2) commits a tortious act within the state, or (3) commits a tortious act without the state causing injury to person or property within the state.[8] Plaintiffs allege that the actions taken by Dr. Arthur Lindgens in New York in connection with the 1951 Sales Agreement and 1951 Settlement Agreement provide the basis for the exercise of specific jurisdiction over both defendants because with Lindgens's actions, Hertie and AWAG both transacted business in New York within the meaning of 302(a)(1) and committed a tortious act against the plaintiffs in the state within the meaning of 302(a)(2). Plaintiffs' theory, however, is one of conspiracy; and 302(a)(1) does not permit the exercise of jurisdiction over a defendant based upon a conspiracy theory of jurisdiction. Levisohn, Lerner, Berger & Langsam v. Med., 10 F.Supp.2d 334, 342 (S.D.N.Y.1998).
A defendant's physical presence in New York is required to establish jurisdiction under 302(a)(2). See, Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 790 (2d Cir.1999)(finding defendant not present in New York when alleged tortious act was defendant's sending an opinion to New York banks). That requirement may be satisfied, however, by the physical presence in New York of a defendant's agent or co-conspirator. Section 302(a)(2) expressly authorizes the exercise *222 of jurisdiction over a non-resident defendant who commits a tortious act within New York through an agent rather than in person. Chrysler Capital Corp. v. Century Power Corp., 778 F.Supp. 1260, 1266 (S.D.N.Y.1991). New York courts have interpreted the term "agent" to include co-conspirators. Id. (closing of fraudulent sale-and-leaseback transaction in New York conferred jurisdiction over co-conspirator nonresident electric utility company).
A plaintiff may not rely solely upon a "bland assertion" of conspiracy to establish personal jurisdiction over a non-resident defendant. Instead, a plaintiff must allege specific facts connecting the non-resident defendant to activity in New York in furtherance of the conspiracy. Lehigh Valley Industries, Inc. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir.1975). More specifically, to establish personal jurisdiction over a defendant based upon the alleged tortious acts of a co-conspirator, the plaintiffs must: (1) make a prima facie showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act in New York during and pursuant to the conspiracy. Simon v. Philip Morris, Inc., 86 F.Supp.2d 95, 120 (E.D.N.Y.2000); Chrysler, 778 F.Supp. at 1266.

a. Prima Facie Showing of Conspiracy
While the evidence is problematical, the court concludes that the Plaintiffs have made a prima facie showing of conspiracy. A prima facie showing of conspiracy under New York law requires an allegation of the primary tort plus four elements: "(1) a corrupt agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage or injury." Simon, 86 F.Supp.2d at 120; Chrysler, 778 F.Supp. at 1267.
The primary tort alleged is fraud. The defendants contend that German law rather than New York law is applicable to plaintiffs' fraud claims. But under New York choice of law rules, New York law governs these claims. The choice-of-law rules of the forum state, New York, apply in this diversity action. Woessner v. Air Liquide, Inc., 242 F.3d 469, 472 (3d Cir.2001)(citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 444 n. 7 (3d Cir.2003)(same). In tort actions, New York applies the law of the jurisdiction having the greatest interest in the litigation, a so-called "interest analysis." Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir.1996). Two separate inquiries determine which jurisdiction has the greater interest: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." Id. (quoting Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001, 1002 (1994)). The most significant contacts are the parties' domiciles and the locus of the tort; and where the parties are domiciled in different states, the locus of the tort is "almost always determinative in cases involving conduct-regulating laws." Id. at 646.
Plaintiffs have alleged each element of fraud. To prevail on a fraud claim under New York law, the plaintiffs must prove that (1) the defendants made a material misrepresentation or omission of material fact; (2) the defendants knew of its falsity; (3) the defendants intended to induce the plaintiff's reliance on the misrepresentation or omission; (4) the plaintiff *223 reasonably relied upon the misrepresentation or omission; and (5) the plaintiff suffered damage as a result of that reliance. See Wynn v. AC Rochester, 273 F.3d 153, (2d Cir.2001)(citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)); Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir.2000). Lindgens' representations to the Wertheim brothers' lawyer were, plaintiffs contend, false and misleading because (1) Lindgens affirmatively represented that the Wertheim Corporation was failing and omitted the material facts that a Hertie subsidiary was interested in acquiring the company, and (2) Lindgens had himself just negotiated a sales agreement with other Wertheim Corporation shareholders in New York that would permit that acquisition to go forward. The letter exchange between the Wertheim brothers' lawyer and Lindgens evidences Lindgens' alleged misrepresentations and omissions. Plaintiffs further allege that Lindgens made these misstatements and omissions with the intent to conceal the pending acquisition from the Wertheim brothers so they would relinquish their restitution claims against the shares held by the former Lindgens consortium members. Finally, plaintiffs allege that the brothers relied upon Lindgens' misstatements and omissions in settling their restitution claims with the consortium members for less than the shares were actually worth and thereby suffered damages as a result of the fraud.
Turning then to the elements of conspiracy, the documentary evidence adduced by plaintiffs establishes a prima facie case of conspiracy to defraud the Wertheim brothers of the fair value of their restitution claims. First, a corrupt agreement between Lindgens, the Wertheim Corporation, and Hertie-subsidiary Union can be inferred from the documentary evidence. Plaintiffs cite the August 1951 Sales Agreement between the Froeb Group and the Hertie Group, which was negotiated by Lindgens. (Friedman Decl.App. A, Ex. 10). Plaintiffs contend that Hertie's complicity in that sales agreement is evidenced by the October 1951 Sales Agreement between AWAG and Union that incorporated by reference the terms of the August agreement. (Friedman Decl.App. A, Ex. 18). First, with the October 1951 Agreement, plaintiffs contend, AWAG and Hertie ratified the terms of the August agreement; and that ratification permits the inference that Lindgens negotiated the terms of the August agreement pursuant to an agreement between Lindgens, AWAG, and Hertie to sell control of AWAG to Hertie.
Second, plaintiffs proffer evidence that Hertie's alleged successor, defendant Karstadt, considered the August 1951 Secret Agreement, which itself was premised upon the Wertheim brothers' settlement of their restitution claims, to be the legal basis for Karstadt's claim to title of properties owned by AWAG before World War II. (Friedman Decl. E's. 21, 23, 24). In particular, plaintiffs point to documents that Karstadt filed last year with German authorities. In a complaint filed with an administrative court in Berlin last year, Karstadt stated that AWAG offered to sell control in 1951 to Union Vereinigte Kaufstatten, a company owned by Karstadt-predecessor Hertie, but the companies could not complete the transaction because "some members of the Wertheim family had made restitution claims and a part of the shares [of Wertheim] had been placed in a trust." (KarstadtQuelle AG Complaint filed with Admin. Court in Berlin, July 23, 2002, Friedman Decl. Ex. 25 at 32). This evidence supports the inference that the defendants' alleged predecessors agreed with Lindgens to defraud the Wertheim brothers by concealing the pending sale of control from them. Lindgens negotiated and signed the August 1951 Agreement *224 and negotiated the Settlement Agreement while in New York. Thus, plaintiffs contend, if the August 1951 Agreement gave Hertie, control of AWAG, then Lindgens had to have been acting on Hertie's behalf while in New York, both with respect to negotiating the Secret Sales Agreement and with respect to hiding that agreement from the Wertheim brothers' lawyer.
The same documentary evidence supports the remaining elements of conspiracy. Plaintiffs satisfy the overt act requirement with the allegation, supported by evidence of Lindgens negotiating the Settlement Agreement in New York, that Lindgens made false statements to and withheld information from the Wertheim brothers' attorney in New York. Plaintiffs satisfy the intentional participation argument with the allegation and evidence that the terms of the October 1951 Agreement closely match the terms Lindgens negotiated in the August 1951 Agreement and coupled with Karstadt's recent acknowledgment that restitution claims against shares in AWAG had to be settled before the planned sale of AWAG to Hertie.
Finally, plaintiffs satisfy the fourth requirement by supporting with competent evidence their claim that the Wertheim brothers were injured.

b. Relationship Between Defendants' Alleged Predecessors and New York Acts of Alleged Coconspirator Lindgens
Having established a prima facie case of conspiracy, plaintiffs must also show Hertie/AWAG's membership in the conspiracy. A plaintiff shows a sufficient relationship between the defendants and the conspiracy to permit the inference that the defendants were members of the conspiracy by establishing:
(a) the defendant had an awareness of the effects in New York of its activity;
(b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and
(c) the co-conspirators acting in New York acted `at the direction or under the control,' or `at the request of or on behalf of' the out-of-state defendant.
Chrysler, 778 F.Supp. at 1269; Simon, 86 F.Supp.2d at 120. Plaintiffs have shown that Lindgens's activity in New York benefitted Hertie/AWAG. Indeed, plaintiffs cite to a document that Karstadt filed with German authorities in which Karstadt explains that the parties to the 1951 sale of AWAG to Union, although they began negotiating the sale in early 1951, could not complete the transaction until late 1951 because restitution claims against AWAG shares by Wertheim family members were outstanding. (Friedman Decl. Ex. 25 at 32).
Plaintiffs also have proffered competent evidence that Hertie/AWAG were aware of the effects in New York of their activity and that Lindgens acted on their behalf. Plaintiffs show Hertie's awareness of the New York effects of the conspiracy with an October 28, 1951 letter from Lindgens to the Wertheim brothers' attorney. (Friedman Decl. Ex. 19). That letter explains that the amount of the settlement offer made by Lindgens to the brothers would be paid from an account at Hertie's bank, Bankhaus Alwin Steffan. Although this letter ultimately may not permit plaintiffs to prove by a preponderance of the evidence that jurisdiction is established, the letter is competent evidence supporting this jurisdictional averment at this stage in the litigation. Moreover, that AWAG granted Lindgens power of attorney with respect to the negotiation of the October 1951 Agreement with Union supports plaintiffs' claim that AWAG had knowledge of Lindgens' activities. Despite the fact that AWAG executed the power of attorney in October 1951, after Lindgens had negotiated the 1951 Secret Sales Agreement *225 in New York, the document evidencing the power of attorney also establishes Lindgens's role in the sale of AWAG. Together with the allegation, supported by documentary evidence, that AWAG and Hertie ratified the terms of the August 1951 Agreement with few changes, the inference that Hertie/AWAG had knowledge of Lindgens's activities is supported. Indeed, the similarity of the terms in the October 1951 Agreement and August 1951 Secret Agreement supports the inference that Lindgens's negotiation of the terms of the August agreement was "on behalf of" AWAG and Hertie.
While the documents plaintiff proffers may not be persuasive evidence of AWAG's pre-October awareness of the conspiracy relationship  and plaintiffs may ultimately fail to meet their burden  the evidence supports a prima facie showing of the relationship between Hertie/AWAG and Lindgens's New York activities to defraud the Wertheim brothers.

c. Lindgens' Tortious Act in New York
Finally, for the reasons already noted, plaintiffs have alleged, citing competent evidence, that Lindgens engaged in fraudulent, and thus tortious, conduct toward the Wertheim brothers in New York.

3. Whether under New York Law the Acts of Lindgens as Agent for Hertie and AWAG Can Be Attributed to Karstadt and Warenhaus Wertheim for Jurisdictional Purposes
A superficial reading of federal court decisions applying New York law would permit the conclusion that for personal jurisdiction purposes the "jurisdictional acts" of a predecessor corporation can be attributed to a successor corporation where the predecessor has merged into and become one with the successor corporation, but not where the successor has simply purchased the assets of the predecessor. Viacom Int'l v. Melvin Simon Productions, Inc., 774 F.Supp. 858, 864 (S.D.N.Y.); J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F.Supp.2d 544 (S.D.N.Y.2001); Linzer v. EMI Blackwood Music, 904 F.Supp. 207, 214 (S.D.N.Y.1995).
But a careful examination of New York state court decisions does not support a simple merger-asset purchase distinction. The issue of predicating "long-arm" jurisdiction in the acts of a predecessor has not been addressed by New York's Court of Appeals, but it has been on New York's intermediate appellate level. While an intermediate appellate decision is not controlling, it must be considered because it is evidence of state law. Robinson v. Jiffy Executive Limousine, 4 F.3d 237, 242 (3rd Cir.1993). Decisions from other state court jurisdictions and federal decisions relying on other than New York appellate law are not really relevant.
In Armour Handcrafts, Inc. v. Miami Decorating and Design Center, Inc., 99 A.D.2d 521, 471 N.Y.S.2d 607 (1984), the trial court had held that it did not have personal jurisdiction under CPLR § 302(a)(4) over a foreign corporation, defendant Miami Decorating and Design Center, Inc., (Miami) as a successor to Oltana Realty Corp., a domestic corporation that had merged with Miami. The Appellate Division held that the trial court "had correctly concluded that it lacked personal jurisdiction over defendant Miami under CPLR § 302." Id. at 608. Nevertheless, the Appellate Division held that there was jurisdiction under a theory of constructive consent. Miami was required to consent to service in New York by virtue of section 907 of the Business Corporation Law, but had not done so.[9] Since Miami had benefitted from the merger, the court held that the certificate of merger *226 containing consent would be deemed to have been duly filed.
If merger alone were enough to attribute Oltana's doing business in New York to Miami, the Appellate Division need only have reversed the trial court. The significance for the case at hand is that the Appellate Division observed that the trial court had correctly determined that it lacked jurisdiction over the foreign corporation even though it had merged with a company doing business in New York, but that the foreign corporation was estopped from contesting jurisdiction.
In Applied Hydro Pneumatics, Inc. v. Bauer Manufacturing Inc., 68 A.D.2d 42, 416 N.Y.S.2d 817 (1979), the Court construed CPLR § 302(a)(1) to permit jurisdiction founded in the acts of the prior New York corporation who had sold its assets to a Connecticut corporation where the decision to complete the contracts was considered a "Nunc pro tunc ratification and adoption" of the predecessor's acts in New York.
This analysis finds support in Schenin v. Micro Copper Corp., 272 F.Supp. 523 (S.D.N.Y.1967). In that case the plaintiff sought to assert personal jurisdiction over Micro Copper Corp in New York based upon Micro's purchase of the assets of a dissolved Nevada corporation. The court rejected the asset purchase as a ground for attributing jurisdiction under CPLR § 302. The court noted: "The insurmountable hurdle in plaintiff's path is the sound distinction in law between a statutory merger and an acquisition of assets." Schenin, 272 F.Supp. at 526. And as Armour Handcrafts, Inc. teaches, the statute in question is section 907 with its requirement for consent to jurisdiction.
Without consent to service, actual or constructive, neither a merger itself or purchase of assets is enough under New York law to attribute a predecessor's acts to a successor for the purpose of asserting jurisdiction under CPLR § 302.
The corporate history of Karstadt and Warenhaus Wertheim would preclude assertion of in personam jurisdiction under New York law. In 1994, a company called Karstadt Aktiengesellshaft ("Karstadt AG") acquired 100 percent of the shares of Hertie Waren-und Kaufhaus GmbH ("Hertie"). (Kreuz Suppl. Decl. ¶ 4.)[10] Karstadt *227 AG became a shareholder in Hertie, which itself continued to exist as a separate company. (See Id.) In 1999, Karstadt AG and Hertie entered into what German law calls a "merger through absorption," through the contractual transfer of all of Hertie's assets to Karstadt AG. (See Id. at ¶ 5.) By operation of German law, Hertie ceased to exist and its liabilities were automatically transferred to Karstadt AG. (Id. at ¶ 5-6.) Also in 1999, Karstadt AG merged with Schickedanz Handelswerte GmbH & CoKG, which was the ultimate parent company of the Quelle group of companies. (Id. at ¶ 7.) The entity resulting from that transaction was defendant KarstadtQuelle AG ("Karstadt"). (Id.) Subsequent to this transaction, Karstadt transferred all of Hertie's business operations, including Hertie's liabilities pertaining to its department store operations to a (then) wholly owned subsidiary of Karstadt named Karstadt Warenhaus AG. (See Id. at ¶ 9.) The parent company, Karstadt, continued to operate only as a holding company. (See Id. at ¶ 7.)
In 1960, Wertheim AG  which during the Nazi era had been named Allgemeine Warenhaus Aktiengesellschaft ("AWAG")  transferred all of its assets, liabilities, and business operations to its subsidiary, defendant Warenhaus Wertheim GmbH. (See Kreuz Suppl. Decl. ¶ 21.) Immediately following that transfer, Wertheim AG was liquidated, and its majority shareholder Hertie became a direct majority shareholder of Warenhaus Wertheim. (Id.) Over the years, subsequent to this reorganization, Warenhaus Wertheim transferred all of its business operations and all but two real estate properties to other entities. (Id. at ¶ 23-25.) Today, Warenhaus Wertheim has no day-to-day operations. (Id. at ¶ 222-25; Schenck Decl. ¶ 3.)
In light of the corporate history of Hertie and AWAG there is no statutory or case law basis to permit the attribution of Lindgens' tortious acts in New York on behalf of Hertie and AWAG in 1951 in order to impose in personam jurisdiction over Karstadt and Warenhaus Wertheim. That is so even if New York law on attribution of jurisdictional facts of one corporation to another were given a latitudinarian reading permitting attribution when the "predecessor" and "successor" are one. E.g., Viacom Int'l Inc. v. Melvin Simon Productions, Inc., 774 F.Supp. 858, 864 (S.D.N.Y.1991).
Applicable here (mutatis mutandis) is the language of Judge Sweet in Schenin v. Micro Copper Corp., 272 F.Supp. 523, 526 (D.C.N.Y.1967):
Plaintiff's novel approach to the jurisdictional issue rests, in effect on an untenable theory of involuntary, retroactive attribution. [Here] there exists no basis in law or reason to impute to Micro, for jurisdictional purposes, activities of Vanura in New York, such as they may have been.

C. Whether the Exercise of Personal Jurisdiction Over the Karstadt and Warenhaus Wertheim would Comport with Due Process[11]
The due process clause of the Fourteenth *228 Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has "certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
Plaintiffs have not presented sufficient evidence of Lindgens's and Hertie's tortious acts in New York necessary to satisfy New York's long-arm statute over Karstadt and Warenhaus Wertheim. However, even if the plaintiff's did satisfy New York law in this regard, the assertion of jurisdiction would have to pass constitutional scrutiny.
If Hertie were being sued, the plaintiffs would have demonstrated the minimum contacts necessary to justify "specific jurisdiction." That is because the plaintiffs' claim arises out of or relates to Lindgens/Hertie's contacts in New York. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). And plaintiffs have also shown that Lindgens/Hertie "purposefully availed" itself of the privilege of doing business in New York and that they could foresee being "haled into court there." See, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).
The court must also consider (assuming New York's long-arm statute reaches) whether the assertion of jurisdiction over Karstadt and Warenhaus Wertheim comports with traditional notions of fair play and substantial justice; that is, whether it is reasonable under the circumstances of this case. Chaiken v. VV Pub. Corp., 119 F.3d 1018, 1028 (2d Cir.1997) (citing Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir.1996)); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 205 (1st Cir.1994); International Shoe, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); Grand Entertainment Group Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 481 (3d Cir.1993). This holds true even though the showing of minimum contacts favors the exercise of jurisdiction. Burger King, 471 U.S. at 477, 105 S.Ct. at 2185.
If a defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable," the court is constitutionally precluded from exercising jurisdiction. Id. The reasonableness inquiry of course applies in a specific jurisdiction case (Asahi and Burger King were both specific jurisdiction cases) and has been held to apply in a general jurisdiction case as well. Metropolitan Life, 84 F.3d 560 at 573.
Whether or not the court's exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice "requires a more concerned focus" where the contacts with New York are not substantial and the entire matter has a substantial connection with another country as here. Cf., Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 479 (4th Cir.1993).
In conducting a "reasonableness" analysis in a particular case, the Supreme Court in Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112-14, 107 S.Ct. 1026, 1032-33, 94 L.Ed.2d 92 (1987),[12] has instructed that the court must evaluate the following factors:

*229 (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate juridical system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.
Metropolitan Life, 84 F.3d at 568 (citations omitted); to the same effect, Grand Entertainment Group v. Star Media Sales, Inc., 988 F.2d 476, 483 (3rd Cir.1993); see also, Burger King, 471 U.S. at 475, 105 S.Ct. 2174.
Upon consideration of this five factor "fairness" test, the Court concludes that the exercise of jurisdiction would be unreasonable,[13] "mindful of the Supreme Court's admonition in Burger King, 471 U.S. at 477, 105 S.Ct. 2174, that dismissals resulting from the application of the reasonableness test should be few and far between...." Metropolitan Life, 84 F.3d at 575.

First: Burden on the Defendant
With no meaningful presence in New York, adjudication in New York would impose a significant burden on Karstadt and Warenhaus Wertheim. Both companies are based in Germany and do not do business in the United States. The situation here is totally dissimilar to that in Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 99 (2d Cir.2000). In Wiwa, the court noted that Royal Dutchman had litigated in the United States on previous occasions, had a 40-year relationship with a United States law firm, faced no language barrier, and had contacts in New York that went "well beyond minimal." Id. at 99. Here, Karstadt and Warenhaus Warenheim have not litigated in the United States on previous occasions, do not have a 40-year relationship with a U.S. law firm, are German corporations that transact business in German, and do in fact face a language barrier. Nor have the plaintiffs established that Karstadt and Warenhaus Wertheim have any meaningful contacts with the state of New York.

Second: Interests of the Forum
New York has minimal interest in adjudicating this case. Gunther Wertheim was a resident of Germany and then New Jersey; and plaintiffs are residents of New Jersey and Illinois. See (Defs' Motion to Dismiss at pp. 20-21.) Letters of Substitutionary *230 Administratorship for the Estate of Gunther Wortham, deceased, were issued to the plaintiffs by the Salem County Surrogate's Court of the State of New Jersey. It cannot really be said that New York's interest in "providing relief ... and discouraging further harmful conduct from being directed at the state" is "pressing." The acts of Lindgens/Hertie of approximately one month's duration in New York fifty years ago were non-recurring. Lindgens's acts carry over into Germany and Germany's Restitution Authority and implicate ownership interests in property in Germany which have been adjudicated by "the Land Berlin, the Berlin Restitution Authority, the German Finance Ministry and several courts." (SAC ¶¶ 207, 212); see, Chaiken v. VV Pub. Corp., 119 F.3d 1018, 1025 (2d Cir.1997) (Plaintiffs living full time in Israel "may lessen Massachusetts's interest in protecting their reputation"); Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished."); see also, Grand Entertainment Group, Ltd. v. Star Media Sales Inc., 988 F.2d 476, 483-84 (3d Cir.1993) (noting the interest of the forum state is primarily to protect its own residents from tortious conduct by out-of-state residents).

Third: Interests of the Plaintiffs in Obtaining Convenient and Effective Relief
The plaintiffs have not demonstrated why their interests in proceeding in a convenient forum would be served by subjecting Karstadt and Warenhaus Wertheim to suit in New York. The plaintiffs are not New York citizens and they have not identified any witnesses or other evidence more convenient to a New York forum rather than a German forum. Indeed, the two key protagonists, Lindgens and Wortham, are deceased. The plaintiffs' interest in litigating in New York must stem from their belief that New York offers a better chance of recovery, a more receptive forum and a more generous statute of limitations. But choice-of-law considerations cannot be invoked by the plaintiffs to establish the unreasonableness of exercising jurisdiction. Metropolitan Life Ins. Co., 84 F.3d 560 at 574. As the Metropolitan Life court explained: "If we thought this consideration relevant, this factor might weigh in favor of the exercise of jurisdiction, in the sense that Vermont could be the only jurisdiction that serves the interest of the plaintiff in obtaining effective relief. However, such questions are not permissible considerations in the context of a jurisdictional inquiry," Id. (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 778, 104 S.Ct. 1473, 1480, 79 L.Ed.2d 790 (1984)(emphasis added)).

Fourth: Efficient Administration of Justice
This factor strongly favors Karstadt and Warenhaus Wertheim because "in evaluating this factor courts generally consider where the witnesses and evidence are likely to be located." Metropolitan Life Ins. Co., 84 F.3d at 574 (citing Caruth v. International Psychoanalytical Ass'n, 59 F.3d 126, 129 (9th Cir.1995)); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1552 (11th Cir.), cert denied, 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993); accord, Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir.2001) (citing Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co., 75 F.3d 147 (3d Cir.1996)). In addition, where there is no evidence of another state or nation having a superior interest than the forum state, courts will readily assert jurisdiction. Cf. Grand Entertainment, 988 F.2d at 484. Here, the superior interest of Germany outweighs the attenuated interests of the forum state of New York.
Both Lindgens and Gunther Wertheim are deceased. Any principal witnesses and *231 documentary evidence of the alleged conspiracy between Lindgens and Hertie would be in Germany and the effect of the alleged fraud was experienced in Germany whose efforts at addressing claims for restitution was undermined. Germany or New Jersey, where Gunther Wertheim's estate is being administered, have far more significant interests in resolving this dispute than does New York.

Fifth: Policy Considerations
Finally, the plaintiffs have not suggested any "fundamental substantive social policies" that favor the exercise of jurisdiction by New York. Burger King, 471 U.S. at 477, 105 S.Ct. at 2184. On the contrary, Germany does have a substantial policy in seeing that claims for restitution of aryanized assets against German companies and the settlement of those claims are resolved fairly and without coercion or fraud and without compromising the integrity of its courts and administrative tribunals. This factor strongly favors Karstadt and Warenhaus Wertheim.
In Ellicott Machine Corp., the Fourth Circuit in holding that the exercise of jurisdiction by Maryland over an Australian company would not comport with Fourteenth Amendment due process noted: "Asahi made clear that these factors apply with particular force in actions against foreign national defendants." 995 F.2d at 479. In the majority section of the Asahi opinion, the court counseled that World-Wide Volkswagen's advice calls for a court to consider
the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by [the States forum]. The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.
Asahi, 480 U.S. at 115, 107 S.Ct. at 1034 (quotations omitted).
This consideration is of particular importance in this case. It would be hard to find a case where the procedural and substantive policies of another country would be more affected by the assertion of state jurisdiction than this case. Although the plaintiffs try to characterize their complaint as one simply involving a fraud committed in New York, much more than that is at stake. The Wertheim brothers presented their restitution claim for Nazi-aryanization to German institutional authorities. (SAC ¶ 78.) The resolution of that claim was then recorded as a judgment of the German court, thereby terminating the proceedings. Because the settlement was recorded, it had the effect of terminating the case that was pending before the restitution court. As a recorded settlement, it constituted a judicial judgment enforceable as such.[14]
Rather than challenging that judgment or seeking to reopen the proceedings in *232 Germany,[15] the plaintiffs ask this court to, in effect, set aside or ignore it in order to grant the relief requested. This court is now being asked to adjudicate a claim against German companies with no meaningful connection to the state of New York. In fact the opposite is true. The Amended Complaint in effect is asking the court to determine the legitimate owner of assets, located, not in New York, but in Germany. For example, paragraph 247 of the Amended Complaint alleges that "defendants wrongfully acquired title to assets located in West Germany, including numerous and valuable properties located in Berlin ..." and paragraph 278 seeks restitution of "all of Wertheim Corp's East Berlin and other East German assets ... seized in accordance with Decree No. 124 dated Oct. 30, 1945 of the Soviet Military Administration." Counts 6, 10, 12 and 13 refer to the unjust enrichment, fraudulent concealment and acquisition of various Potsdamer Platz properties. Plaintiffs contend that the 1951 Settlement Agreement did not release restitution claims on the real estate interests. (Druba Decl. ¶ 28).
Further implicating the interests of Germany and the intrusion of this litigation into German affairs is the fact that the Conference on Jewish Material Claims against Germany has asserted claims on behalf of the Plaintiffs and other Wertheim family members for certain former East German real estate interests of the former AWAG. (Further Declaration of Dr. Thomas Schmidt-Kotters ¶ 7.) Specifically, administrative court proceedings are pending in Germany today regarding former assets of Geschaftshaus GmbH (a subsidiary of AWAG) and Warenhaus Wertheim in Berlin. (Schmidt-Kotters Further Decl. ¶ 4).
The assertion of jurisdiction under these circumstances would seriously trespass on the sovereignty of Germany and the integrity of its own judicial system. Cf., Core-Vent Corp. v. Nobel Industries, 11 F.3d 1482,1490 (9th Cir.1993)("Requiring [Swedish doctors] to submit to the jurisdiction of the court would impose substantial burdens on them and would interfere with the sovereignty of a foreign nation.") (applying there the foreign-acts-with-forum-effects jurisdictional principle); see also, Pacific Atlantic Trading Co., v. M/V Main Express, 758 F.2d 1325, 1330 (9th Cir.1985)(In holding Federal court in California could not assert personal jurisdiction over Malaysian defendants, the court noted that sovereignty of Malaysia undermined the reasonableness of personal jurisdiction, even though (unlike here) Malaysia had not "explicitly voiced a sovereign interest in this case....").
The defendants have asked this court to dismiss the complaint because the claims asserted against the German companies arise out of the Nazi era and World War II and raise non-justiciable political questions. The defendants also argue that the court should dismiss the plaintiffs's claims under the act-of-state doctrine or abstain on international comity grounds. The defendants point to the Executive Agreement[16] which states that the Foundation is *233 to be the exclusive remedy and forum "for the resolution of all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." Executive Agreement, Art. 1(1)(emphasis added).
The defendants correctly note that the German Foundation Law establishes the Foundation as a sovereign instrumentality of the Federal Republic of Germany to provide payments to claimants who suffered loss of or damage to property at the hands of German companies during the Nazi era. The Law provides that the Foundation shall be the exclusive remedy and forum for all claims asserted against German companies arising out of the Nazi era and World War II:
Payments from public funds ... and from German business enterprises for injustice suffered under National Socialism ... may be claimed only under the terms of this Law. Any further claims in connection with National socialist injustices are excluded.
Foundation Law ¶¶ 9,11; see generally, American Insurance Association v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); In re Austrian and German Bank Holocaust Litigation, 317 F.3d 91 (2d Cir.2003).
The defendants argue that claims like those asserted by plaintiffs have consistently been dismissed by courts of the United States. See e.g., Kelberine v. Societe Internationale, 363 F.2d 989, 995 (D.C.Cir.1966); Burger-Fischer v. DeGussa A.G., 65 F.Supp.2d 248 (D.N.J.1999); Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424 (D.N.J.1999); Deutsch v. Turner Corp., CV 00-4405 SVW (AJWx)(C.D.Cal.Aug.25, 2000); Frumkin v. Jones (In re Nazi Era Cases Against German Defendants Litigation), 129 F.Supp.2d 370 (D.N.J.2001)
In response, the plaintiffs argue that their claims do not raise non-justiciable political questions and that the doctrine of international comity and act-of-state doctrine are not applicable because they are not seeking restitution for the aryanization of AWAG shares forcibly taken during the Nazi era. Rather, the plaintiffs are seeking damages for being defrauded of the true value of their restitution claim. Consequently, the various lawsuits ending in dismissal against German companies are not relevant.
In further support of this argument plaintiffs point to a letter addressed to plaintiffs' counsel by Stuart E. Eizenstat, who co-chaired a series of formal and informal discussions among lawyers for both plaintiffs and defendants and the German Government on a "proposed initiative to establish a foundation to make payments to victims of slave and forced labor and all others who suffered at the hands of German companies during the Nazi era." Frumkin, 129 F.Supp.2d at 379:
The initiative that led to the establishment of the German Foundation was not intended, however, to address claims that do no place at issue the Nazi-era conduct of defendant German companies. Accordingly, because the claims brought against the defendants in the Wortham action do not place at issue their Nazi-era conduct, the United *234 States should not be obligated, under the German Foundation Agreement, to file a Statement of Interest in the Wortham action recommending dismissal of plaintiff's claims.
(Eizenstat Opinion at 2, dated Sept. 5, 2002.)
The plaintiffs also note in support of their argument that their claim does not arise out of the Nazi era and that the United States Government has not filed in this case a Statement of Interest.
In response to this argument the defendants ask this court to look to the plain meaning of the phrase "arising from" as understood under international law and construe it liberally to give effect to the purpose of the Executive Agreement. The defendants argue that the claim is inextricably connected with the Nazi confiscation of the Wertheim Brothers shares and is a claim arising out of the Nazi era.
Because the Court does not have jurisdiction and cannot constitutionally exercise jurisdiction over the defendants, the Court need not resolve whether the claims arise out of the Nazi era. That the plaintiffs' tort claim may not be within the scope of the Foundation Law as, Stuart Eizenstat states, is wholly irrelevant to the Asahi due process factors. The resolution of whether the plaintiffs' claims fall within the scope of "arising under" does not in any way bear on the court's analysis of Asahi's due process consideration of the impact of the exercise of jurisdiction on the procedural and substantive interests of Germany and the interest of the United States Government in its foreign relations with Germany.
That the exercise of jurisdiction would have such an impact is further reinforced by the letter to this court of Wolfgang Ischinger, the Ambassador of the Federal Republic of Germany:
It was an agreed principle in the negotiations leading to the Executive Agreement that the question of German post-war restitution and compensation should not be reopened. Most of the post-war restitution claims were settled by restitution settlements which became binding long ago. Allowing for litigation of settlement-related claims based on alleged fraud in U.S. courts would clearly contravene this principle. Such claims cannot be separated from the underlying restitution claims undisputedly arising from the National Socialist era, the substance of which currently is subject to ongoing negotiations between the German Federal Ministry of Finance and the Conference on Jewish Material Claims against Germany, Inc.
While it is unusual for courts to dismiss cases because the exercise of personal jurisdiction is unreasonable, where the application of Asahi factors demonstrate (as here) that the exercise of jurisdiction would be unreasonable, the requirements of due process demand dismissal. See e.g., Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co., 75 F.3d 147, 153-54 (3d Cir.1996); Metropolitan Life Ins. Co., 84 F.3d at 575; Ticketmaster, 26 F.3d at 210; Ellicott Mach. Corp., 995 F.2d at 479; Chaiken v. VV Publishing Corp., 119 F.3d 1018 at 1030.
Upon evaluation of the five-factor "fairness" test of Asahi and Burger King, the Court concludes that the exercise of jurisdiction by this Court would be unreasonable. The plaintiffs' interest in litigating in New York is so minimal and New York's interest in adjudicating this case is so attenuated that "the exercise of personal jurisdiction would violate our basic sense of `fair play and substantial justice'  and deprive the defendants of the due process guaranteed by the Constitution." Metropolitan Life Ins. Co., 84 F.3d 560 at 575; see also, Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co., 75 F.3d 147 (3d Cir.1996).
*235 Applying a sliding scale to the due process inquiry reinforces the Court's previous analysis and conclusion that the exercise of jurisdiction in the circumstances of this case would be unreasonable. The facts supporting Lindgens acting as agent or co-conspirator with Hertie are thin at best. It is hardly an exaggeration to say that they are a borderline showing of minimum contacts. Such marginal jurisdictional facts serve to fortify the factors weighing against the exercise of jurisdiction. But with or without the application of a sliding scale, the analysis of the five-factor Asahi test vividly demonstrates the unreasonableness of exercising jurisdiction over defendants Karstadt and Warenhaus Wertheim. The court therefore grants the defendants' motion to dismiss.
NOTES
[1] This Court has subject matter jurisdiction, pursuant to 28 U.S.C.A § 1332, under diversity of citizenship.
[2] He changed his name from Wertheim to Wortham sometime after leaving Germany.
[3] Wiedergutmachungsamt der Gross Berlin.
[4] Union Vereinigte Kaufstatten GmbH and Hertie Vereinigte Kaufstatten GmbH, subsidiaries of Hertie Waren-und Kaufhaus GmbH, were the original companies involved with the 1951 sales agreement. Soon thereafter, they transferred the interests variously to Hertie Waren-under Kaufhaus GmbH. (SAC ¶¶ 95, 145, 155). These Hertie entities are collectively referred to as "Hertie" in the opinion.
[5] The Potsdamer Platz (i.e., square), located at the center of Berlin, was prior to World War II a busy commercial area. The square was damaged during the war and divided afterward, like Berlin itself, by the Berlin Wall. The square is now again a busy commercial area.
[6] Just prior to transfer, plaintiffs voluntarily dismissed the Estate of Lindgens as a defendant, Civ. Action No. 01 CV 2741(LAP)(Aug. 6, 2002).
[7] Even if New York permitted purchases to support general jurisdiction the due process clause of the Fourteenth Amendment would not. Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 417-418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
[8] "(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act ...; or 4. owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. 302 (McKinney 1990).
[9] N.Y. Business Corporation Law § 907 (McKinney's 1990).
[10] To refute allegations that Karstadt and Warenhaus Wertheim are legal successors to Hertie and AWAG, defendants properly submitted a supplementary declaration of Dr. Harald Kreuz. (Supplementary Declaration of Dr. Harald Kreuz, March 3, 2004). The fact that a court is required to accept properly supported evidence by a plaintiff as true does not preclude a court from receiving and weighing affidavits from both parties. See e.g., Rappoport v. Steven Spielberg, Inc., 16 F.Supp.2d 481, 488 n. 17, 507-08 (D.N.J.1998); Lynn v. Cohen, 359 F.Supp. 565 (S.D.N.Y.1973); 1995 WL 450274 *2 (S.D.N.Y. July 31, 1995); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (1969). As legal conclusions do not make for factual allegations, Defendants may refute plaintiffs' unsupported allegations with "direct, highly specific, testimonial evidence." See, Schenker v. Assicurazioni Genereali S.p.A., Consolidated, 2002 WL 1560788 (S.D.N.Y. July 15, 2002)(holding that plaintiffs' conclusory allegations on sufficient business contacts within the forum may be rebutted with defendant's fact-specific testimonial evidence).

Plaintiff's challenge to this submission is unsupported and ultimately fails. Contrary to Plaintiffs assertions, Defendants did not concede that they were legal successors-in-interest of Hertie and AWAG. (See, Defs' Mem. in Supp. of Mot. to Dismiss at 12, 13.) Despite Plaintiffs contention that they "were not permitted to conduct discovery regarding the defendants' corporate histories and relationships" (Pls' 2d Supp. Mem. at p. 1.), Defendants provided discovery of several corporate relationships in response to Plaintiffs' inquiries. (e.g., Pls' First Interrogs. Nos. 1-4, 6; Defs' Ans. First Interrogs.; see also, Pls' Supp. Mem at p. 5 n. 2) (showing Plaintiffs' belief that they had sufficient information from the discovery to date to survive the 12(b)(2) motion.) Further, the record lacks any specific factual evidence relevant to Plaintiffs' conclusion that defendants are legal successors-in-interest to Hertie and AWAG. In fact, Plaintiffs' Exhibit 25 (Karstadt complaint) appears to corroborate the direct, specific testimonial evidence from Dr. Kreuz's supplementary declaration. (Friedman's Decl. Ex. 25.) Accordingly, the supplementary declaration was properly submitted and is one of the various affidavits on record that the court may take into account to render its decision on jurisdiction.
[11] The Court does not address defendants' argument that due process would never permit the attribution of jurisdictional facts of a forum defendant to a non-forum defendant because under Calder v. Jones, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)"[e]ach defendant's contacts with the forum State must be assessed individually." See also, Gonzalez v. Press Parts, Inc., 1995 WL 608307 (S.D.N.Y.Oct.16, 1995) and Rutgerswerke Ag v. Abex Corp., 1995 WL 625701 (S.D.N.Y.)
[12] See generally, Earl M. Maltz, Unraveling The Conundrum Of The Law Of Personal Jurisdiction: A Comment On Asahi Metal Industry Co. v. Superior Court of California, 1987 Duke L.J. 670 (1987).
[13] There is another consideration operating in this case to justify dismissal under the five-factor reasonableness test. In evaluating reasonableness under the due process inquiry courts have evoked a sliding scale: "[T]he weakness of plaintiff's showing of minimum contacts places greater emphasis on the reasonableness of exercising jurisdiction." Chaiken v. VV Pub. Corp., 119 F.3d at 1030 (citing Metropolitan Life, 84 F.3d at 568); see also Burger King, 471 U.S. at 477, 105 S.Ct. at 2184. In Metropolitan Life, the court noted that "the criteria may work either to shrink the minimum contacts threshold (thus facilitating the assertion of general jurisdiction) or to defeat general jurisdiction entirely." 84 F.3d at 569 (quoting Donatelli v. National Hockey League, 893 F.2d 459, 465 (1st Cir.1990)); see also, id. at 569 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir.1994) ("We think ... that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts.]" Ellicott Mach. Corp. v. John Holland Party, Ltd., 995 F.2d 474, 479 (4th Cir.1993)(finding that insubstantial nature of defendant's minimum contacts with forum state required "a more concerned focus on the second prong of the due process analysis."))).
[14] Declaration of Professor Dr. Harm Peter Westermann ¶ 44: "Unlike a merely private agreement a court-recorded settlement such as the 1951 Settlement can and will be enforced by the German courts in the same manner a court judgment would be enforced." See generally, (Westermann Suppl. Decl.; Westermann Further Suppl. Decl.) Matthias Druba in his Declaration opined that "under German law, there is little difference between an out-of-court settlement and a settlement recorded before a court of law." (Druba Decl. ¶ 29) And Dr. Hans-Peter Schwintowski was of the opinion that the 1951 Settlement is "technically a simple settlement under contract law, which as the special feature of having been recorded by a Restitution authority." (Schwintowski Decl. ¶ 20.) The Court finds the opinion of Dr. Westermann more persuasive.
[15] See, Westermann Decl. ¶ 44.
[16] On August 12, 2000 the German Bundestag enacted a law creating the Foundation "Remembrance, Responsibility and the Future" as an instrumentality of the Federal Republic of Germany. This was the result of international negotiations leading to two agreements executed on July 17, 2000 in Berlin:(1) the "Executive Agreement," an agreement between the Government of the Federal Republic of Germany and the Government of the United States of America concerning the Foundation and (2) the Joint Statement on the occasion of the final plenary meeting concluding international talks on the preparation of the Foundation. See, In re Nazi Era Cases Against German Defendants Litigation, 198 F.R.D. 429 (2000); In re Nazi Era Cases Against German Defendants Litigation, 129 F.Supp.2d 370 (D.N.J.2001)